**UNITED STATES FIDELITY AND
GUARANTY COMPANY,
Petitioner,**

v.

**THOMPSON AND GREEN MACHIN-
ERY COMPANY, INC., Respondent.**

Supreme Court of Tennessee.

March 29, 1978.

Rehearing Denied July 24, 1978.

Louis Farrell, Jr., David G. Gray, Nashville, for petitioner.

Lewis B. Hollabaugh, Olin White, Manier, White, Herod, Hollabaugh & Smith, Nashville, for respondent; W. Harold Bigham, Gullett, Steele, Sanford & Robinson, Nashville, of counsel.

## OPINION

BROCK, Justice.

This is an action to recover rent from an alleged lessee and its surety. The claim of Thompson and Green Machinery Company, a dealer in heavy construction equipment, arises out of defaults by James F. Gregory, Inc., a highway contractor, in the payment of monthly installments due plaintiff on thirty items of road-building equipment under twenty-six written agreements, plus certain repairs and parts furnished by Thompson and Green to Gregory. The equipment was used on seven separate state highway contracts on which Gregory was the principal contractor and on three state highway contracts on which Gregory was the subcontractor. United States Fidelity and Guaranty Company gave its bond in statutory form on the obligation of the contractor as required by T.C.A. § 54–519 and on the seven contracts which Gregory held with the State. USF&G also executed a performance bond for Gregory on the three highway jobs for which he was the subcontractor.

Thompson and Green filed suit against Gregory and USF&G in the Chancery Court for the amounts allegedly due under the agreements. Gregory defended that the "rentals" were actually "sales" and counterclaimed for damages arising from the breach of an alleged novation between Thompson and Green and Gregory, i. e., Thompson and Green's refusal to conduct an auction of the equipment as allegedly agreed, with the proceeds to be applied first to the remaining debt owed Thompson and Green with excess payable to Gregory as his "equity" in the equipment. Gregory subsequently amended his answer and counterclaim, alleging that he had returned the equipment to Thompson and Green pursuant to an agreement for its disposal by auction and that Thompson and Green had failed to sell or dispose of the equipment as required by Article 9 of the Uniform Commercial Code. However, the latter insistence was not made in this Court, and, therefore, is not before us for determination.

Each of the twenty-six agreements between Thompson and Green and Gregory is a form contract denominated "Associated Equipment Distributors Uniform Lease Contract." Each contract provides that Thompson and Green "proposes to lease and does lease" the described item of equipment upon payment of a monthly rental of a fixed amount for a specified minimum term, ranging from three to fifteen months. Except for provisions allowing for the lessor's repossession for failure to pay rent or other breach of the lease by the lessee, the contracts are renewable on a month to month basis by the lessee. The lessee thus had the right to terminate the agreement upon expiration of the specified minimum term or the right to extend the lease for a period equivalent to the asset's useful life. Gregory testified that his only obligation under the contracts in issue was to pay the

monthly rental for the minimum rental period and that he had no obligation to pay the purchase price of the equipment. At the end of the minimum rental period, Gregory could return the equipment and be liable only for the accrued rental.

Each contract also states the "total value," exclusive of sales tax, of the equipment leased which was shown at trial to be the purchase price of the machinery in the event the lessee elected to purchase. No evidence as to the projected market value of the equipment was introduced. The contracts further obligate the lessee to keep the equipment insured and to pay all repair bills, taxes and other public charges and assessments on the equipment.

The contracts themselves contain no express option to purchase the equipment but proof of a collateral oral option to purchase was adduced at trial. USF&G's evidence was that plaintiff orally agreed that all rentals paid would be credited against the purchase price and that when the aggregate rentals equalled the "total value" figure shown on the lease, defendant would have the option of receiving title upon payment of a small financing charge. Thompson and Green testified that it had an unwritten policy of extending an option to purchase to a lessee who had paid rentals on a given piece of equipment in an amount equal to the total value of the equipment, but insisted that the option was extended only if the lessee's account were paid up and in good order.

USF&G conceded that if the equipment contracts were true leases, the unpaid rentals of equipment by a public contractor constituted "materials furnished" within the meaning of its statutory bond and that it would therefore be liable to plaintiff. USF&G insisted, however, as did Gregory, that the contracts in question, although leases *in form*, were not true leases and that the parties intended that the transactions create security interests in the equipment, liability for which was not covered under its bonds.

Alternatively, USF&G argued that Thompson and Green's recovery should be diminished by: (1) $112,817.76—representing claims of Thompson and Green against Gregory not timely filed as required by T.C.A. § 54–522, and (2) $71,071.59—representing payments made by Gregory and applied by Thompson and Green to an account not covered under the terms of the surety's bond which Thompson and Green should have applied to the secured debt.

The Chancellor determined that the equipment contracts were true leases and, thus, that Thompson and Green was entitled to recover its provable claims for unpaid rent and for services, parts and repairs rendered Gregory during the terms of the leases. The Chancellor dismissed Gregory's counter-claim based upon the alleged novation, finding, as a matter of fact, that no contract to conduct an auction of the equipment was ever consummated between the parties. Refusing both arguments for diminution of plaintiff's recovery against USF&G, the Chancellor entered judgment against both Gregory ($403,382.23 plus interest) and USF&G ($273,753.84).

Only USF&G appealed. The Court of Appeals affirmed the Chancellor in part, but did allow USF&G a credit for the $71,071.59 applied by Thompson and Green to unsecured obligations of Gregory, thus reducing the judgment against USF&G to $202,682.25 plus interest.

Both parties filed petitions for certiorari. Finding no error by the Court of Appeals with regard to its allowance of the credit in favor of the surety, we granted only the petition of USF&G.

## I

The primary significance, in this case, of the distinction to be drawn between a true lease and a conditional sale with a "lease" employed as a security device is to be found in our law requiring highway contractors to provide a surety bond "for the full and faithful performance of every part and stipulation of the contract, especially the payment for all materials furnished and for all labor employed in the contemplated work." T.C.A. § 54–519. In *Southern Construction*

*Co. v. Halliburton*, 149 Tenn. 319, 332, 258 S.W. 409, 413 (1924), the court noted that "[w]hile there are some differences, the rights of laborers and materialmen to recourse against the general contractor and his surety, under [the antecedent of T.C.A. § 54–519], are similar to the rights of such parties to a lien under our mechanic's lien statutes." *See* 17 Am.Jur.2d *Contractors' Bonds* § 44 (1964).

Thus, in *Southern Construction Co., supra*, the Court disallowed a supplier's claim for oil, automobile casings and tubes, finding insufficient evidence that the materials were "consumable in the use or intended to be consumed in the use" of the construction job. Noting that the statutory predecessor of T.C.A. § 54–519 provided for final acceptance of the contract only when the Highway Department was satisfied that all "materials used" by the contractor had been paid for, the Court reasoned that

> "[i]t would be too broad a construction of this statute to fasten such a liability upon the general contractor and the surety for materials which the subcontractor purchased, which were not used up in the job, and remained the property of the subcontractor to be thereafter used by him in other work." *Southern Construction Co., supra*, at 335, 258 S.W. at 414.

In *Nicks v. W. C. Baird and Co.*, 165 Tenn. 89, 52 S.W.2d 147 (1932), the court considered the application of the bond required by the statutory precedent of T.C.A. § 54–519 to rental charges for a steam boiler used by a contractor in the construction of a state highway bridge. Identifying two purposes for the "materials consumed" requirement of the statute, the court stated:

"If the material furnished is not consumable in the use, it is furnished on the general credit of the contractor, and not merely in aid of the performance of the particular contract. And if on completion of the building or project the material, still possessing value, remains the property of the contractor, liability for its costs should be and is his liability alone . . . ." *Id.* at 94, 52 S.W.2d at 148. Determining that neither of these reasons was present "when all that is purchased is the use of the material in the execution of the particular contract, under an agreement of hire or lease," the court concluded that, in such case, "all that is purchased is consumed in the use, in aid of the contract, and, . . . nothing is sought to be charged against the bond except the value of material furnished the contractor in the performance of his contract." *Id.* The court consequently allowed the claim for rental payments against the surety company. Accord, *Thompson and Green Machinery Co. v. M. P. Smith Construction Co.*, 44 Tenn.App. 26, 311 S.W.2d 614 (1957) (construing T.C.A. § 54–519).

■ Thus, rental payments for materials used by a contractor in the execution of a state highway contract are recoverable against his surety. Payments which consummate in the actual *sale* of the material to the contractor are not so recoverable.

## II

■ The parties have assumed in this case that the UCC definition of a "security interest," T.C.A. § 47–1–201(37)[1] provides

1. " 'Security interest' means an interest in personal property or fixtures which secures payment or performance of an obligation. The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (§ 47–2–401) is limited in effect to a reservation of a 'security interest'. The term also includes any interest of a buyer of accounts, chattel paper, or contract rights which is subject to chapter 9 of this title. The special property interest of a buyer of goods on identification of such goods to a contract for sale under § 47–2–401 is not a 'security interest', but a buyer may also acquire a 'security interest' by complying with chapter 9 of this title. Unless a lease or consignment is intended as security, reservation of title thereunder is not a 'security interest' but a consignment is in any event subject to the provisions on consignment sales (§ 47–2–326). Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or

the controlling criterion for determining whether the transactions here involved are leases or are contracts of conditional sale. Many authorities construing and applying that definition are cited and discussed in the briefs. With this assumption, however, we respectfully disagree; that definition, in our opinion, is not applicable to this case.

The UCC has many provisions, especially in chapter 9 thereof, which apply to "security interests"; therefore, "security interest" is defined in § 1–201(37) for the purpose of identifying the transactions to which those provisions apply. In this case, however, we are not concerned with any provision of the Uniform Commercial Code regarding a "security interest"; instead, our concern is with liability under the contractor's surety bonds which, in turn, depends upon whether the construction equipment was *leased* from the plaintiff or *purchased* from him. Our issue is whether the "property" or "title" in the various machines was to pass to Gregory. Under our cases, *supra*, that is the issue upon which liability turns. The UCC does not contain the criteria for making that determination. See 67 Am.Jur.2d *Sales* § 31 (1973). To find those criteria we must turn to the common law. The UCC definitions, according to their terms, are to be applied only in interpreting and administering the Uniform Commercial Code; they are not intended to apply universally, *Parkridge Hospital, Inc. v. Woods, Commissioner*, Tenn., 561 S.W.2d 754 (1978), and they certainly do not apply in a case such as this in which no provision of the UCC is invoked. We note, in passing, however, that there is no conflict apparent between the common law rules hereinafter applied and the UCC definition of "security interest" above quoted. *See* Coogan, *Leases of Equipment and Some Other Unconventional Devices*, 1973 Duke L.J. 909.

At common law the distinction between a true lease and a conditional sale contract in which a "lease" is utilized as a device for retaining title in the seller until the buyer pays the price is fairly well delineated. The opinion of this Court in *Singer Manufacturing Company v. Cole*, 72 Tenn. 439 (1880) is one of the leading authorities.

■ Perhaps the most revealing test is whether the so-called lessee is obligated to accept and pay for the property or is obligated only to return or account for the property according to the terms of the lease from which he may be excused only if he exercises his privilege of purchasing it. If the latter is the case the transaction is a true lease but if the contract, whatever its form, imposes an absolute obligation to pay for and accept the property and the transferor may require its return only upon default of the transferee, the transaction is a conditional sale. *Singer Manufacturing Company v. Cole, supra*; 8 Am.Jur.2d *Bailments* § 32 (1963).

■ Of course, the intent of the parties is always controlling and is to be ascertained from the whole transaction, not merely from the language employed.

■ In close cases the courts consider whether the payments required of the transferee are in such amounts, spread over such a period of time, and are to be so made that compared with the original value of the property, its depreciation and likely value at the end of the term, that they may be reasonably considered as compensation *for the use* of the property or, instead, as payments on an absolute obligation *for the purchase price*, as in a conditional sale.

■ Our examination of the evidence in the instant case compels the conclusion that it amply supports the finding and conclusion of the Chancellor and the Court of Appeals that the intention of the parties in each of the contracts here in issue was merely to create a lease rather than a conditional sale of the machinery involved. In no instance has Gregory, the transferee, obligated himself to become the owner of the property leased and to pay the purchase price thereof. Indeed, he purposely avoided assuming that obligation. In each instance

has the option to become the owner of the property for no additional consideration or for

a nominal consideration does not make the lease one intended for security."

Gregory obligated himself to pay rental for the minimum period only, so that his total payments obligation with respect to each machine varied, as a percentage of the purchase price,[2] or total value, from approximately 5% to approximately 60%.[3] In each instance Gregory had the right to terminate the lease at the end of the minimum lease period and at any time thereafter without paying the substantial equivalent of the value of the property leased; his only obligation was to pay the agreed rental for the period the property was used. We, therefore, concur in the finding of the Chancellor, approved by the Court of Appeals, as follows:

> "The absence of an obligation to pay the purchase price of the equipment is totally inconsistent with Gregory's contention that he had bought, and Thompson and Green had sold, this equipment. Common sense dictates that Thompson and Green would not have sold the equipment in question for the amount of the minimum rental. Yet that was Gregory's only obligation under the contract. Witness James Gregory's testimony amounts to saying, on the one hand, 'these lease contracts were executed as security,' and on the other, 'there was no underlying obligation to be secured.'"

The accounting methods employed by each of the parties with respect to the rental payments made by Gregory and the listing of the machinery in question as inventory may be considered to be more indicative of the hope of the parties to minimize federal income taxes than of the true nature of the transactions between them. The inferences, if any, to be drawn from these accounting methods cancelled out each other, Gregory's being consistent with leases and Thompson and Green's being consistent with conditional sales.

We affirm the holding of the Chancellor and of the Court of Appeals that the trans-actions in issue were leases and not conditional sales.

### III

USF&G insists that the failure of Thompson and Green to comply with the 30-day notice of claims required by T.C.A. § 54–522 releases it from its bond obligation on five of the seven highway contracts Gregory held with the State.

While it is undisputed that notice was not filed with the Department of Highways within 30 days as to the claims of Thompson and Green totalling $112,817.76, we do not think the notice requirements for recovery of the "retainage" held by the State are applicable in a suit such as this that seeks recovery directly against the surety as allowed by T.C.A. § 54–519. Neither do we think that the provisions of T.C.A. § 12–421 requiring notice of outstanding claims within 90 days after completion of a public contract are applicable.

In reaching these conclusions we note that Chapter 4 of Title 12 sets forth the provisions applicable to public contracts in general and that Chapter 5 of Title 54 sets forth the provisions applicable to highway contracts, a subset of public contracts.

With regard to *public contracts*, Section 12–417 requires a contractor's bond to guarantee payment of labor and materials used in the performance of a public contract. Section 12–420 authorizes a direct action against the surety by a furnisher of labor or materials if the contractor should disclaim responsibility for payment. The notice of such claim required for recovery against the surety is set forth in Section 12–421; the time period within which such actions for recovery must be brought is specified in Section 12–422.

With respect to *highway contracts*, Section 54–519 requires that all contractors

---

2. We consider the projected *market value* compared to the lessee's total obligation to be a preferable measurement because the purchase price remains constant while depreciation continues. See *Granite Equipment Lease Corp. v. Acme Pump Co., Inc.*, 165 Conn. 364, 335 A.2d 294 (1973). However, we have compared the purchase price with the rental obligation in this case because projected market values are not included in the record.

3. See table in Appendix.

who enter into contracts with the Highway Department make a bond guaranteeing the full performance of those contracts as well as the payment for all materials purchased and for all labor employed in performance of the contracts. Prior to 1967, however, Chapter 5 of Title 54 did not provide for suits against sureties at all. Rather, this Chapter contemplated only recovery against the "retainage" held by the State—a percentage of the contract price withheld from payment until completion of the contract and acceptance of the work. *See* T.C.A. § 54–521.

Section 54–522 prohibits full settlement with the contractor (payment of the retainage required by Section 54–521) until advertisement is given of impending settlement with the contractor and claimants are given 30 days from the date of final publication of the advertisement within which to file notice of claims with the Department of Highways.

Section 54–523 then requires the commissioner of the highway department to withhold a sufficient sum from the contract price to pay all claims of which he has received notice. He is to withhold this sum for 60 days, during which time claimants must file suit. On the date set for full settlement with the contractor, the contractor may elect to make a refunding bond to the State for the amount withheld by the Commissioner. If a refunding bond is made, the contractor may be paid in full.

The notice requirements of Section 54–522 and the 60-day period of limitation on commencement of actions provided by Section 54–523 apply by their very terms only to claims asserted against the retainage fund in the hands of the Commissioner of Highways. In our opinion, these sections have no application to suits against the surety on the original payment bond by furnishers of labor or material. *See Atlantic Refining Co. v. Standard Accident Insur-*

*ance Co.*, 174 Tenn. 11, 120 S.W.2d 687 (1938).

In *Thompson and Green Machinery Co. v. Travelers Indemnity Co.*, 57 Tenn.App. 592, 421 S.W.2d 643 (1967), it was noted that Chapter 5 of Title 54 (the Highway Act) did not provide for suits against sureties at all.[4] Applying well-established principles of statutory construction, the Court of Appeals determined that statutes applying to the broad category of public contracts (Chapter 4 of Title 12)—unless inconsistent with the Highway Act (Chapter 5 of Title 54)—applied to state highway contracts as well. The court thus held "that for the purposes of defining the rights of subcontractors, laborers and materialmen against sureties on performance bonds, T.C.A. § 12–422 [limitation of actions] is applicable to all public contracts, including State highway contracts." *Id.* at 646.

In 1967, however, T.C.A. § 54–519 (the Section requiring highway contractors to execute a surety bond) was amended by adding a second paragraph to that Section, authorizing suits brought directly against the surety:

"All actions on bonds furnished under this Section shall name the Commissioner of Highways as a party-defendant and may be instituted in any court of competent jurisdiction in this State, but no such action shall be commenced after the expiration of one (1) year following the date of the first publication of the notice provided for in § 54–522 with respect to the involved project." Public Acts of 1967, ch. 380, § 1.

It is immediately apparent that the 1967 amendment did not provide that notice of claims be given, the sole limitation of the amendment being that suits on highway contractors' bonds be commenced within one year following the date of the first publication of the notice provided in Section 54–522.

**4.** As discussed *infra*, the Highway Act was amended in May of 1967 to authorize suits brought directly against the surety. Pub. Acts of 1967, ch. 380. Section 2 of ch. 380 set July 1, 1967, as the effective date of the amendment to T.C.A. § 54–519 and provided that the amendatory language "shall not apply to any contracts or bonds entered into or given prior to that date, or to any action brought after that date on such contracts or bonds entered into or given prior thereto."

We are of opinion that the Legislature intended that the 1967 amendment of T.C.A. § 54–519 specify the sole limitation on actions on highway contractors' bonds and that, therefore, the notice provisions of T.C.A. § 12–421 do not apply in lieu of specific notice requirements in the Highway Act.

T.C.A. § 12–421 provides for the giving of a ninety day notice by those seeking to "secure the advantage of T.C.A. § 12–417–12–422." The 1967 amendment to T.C.A. § 54–519, being repugnant thereto, rendered T.C.A. § 12–422 inapplicable and no other section of Title 12, Chapter 4 of the Code is involved in a suit against a surety on a highway contractors bond. T.C.A. § 54–519 is the only applicable statute since it now embraces all of the subject matter involved in such actions. It is clear that such suits do not seek to "secure the advantage" of any sections of the chapter on general public contractors and it follows that the notice requirements of T.C.A. § 12–421 were rendered inapplicable by the 1967 amendment.

It seems to us highly unlikely that the Legislature intended to supplant the statute of limitations applicable to the broad category of public contracts, T.C.A. § 12–422, with the one year provision of the 1967 amendment while leaving intact only the notice requirements found in T.C.A. § 12–421, a provision in a different Title and Chapter of the Code. We conclude that a claimant is not required to give notice of his claim when seeking recovery directly against a highway contractor's surety.

Having concluded that the agreements between Thompson and Green and Gregory were leases and not conditional sales and that, consequently, under T.C.A. § 54–519 USF&G is liable for unpaid rentals and, further, that Thompson and Green was not required to give notice of its claim, we affirm the judgment of the Court of Appeals. Costs of this appeal will be taxed against petitioner, United States Fidelity and Guaranty Company.

HENRY, C. J., and FONES, COOPER and HARBISON, JJ., concur.

## APPENDIX

| Date Contract Executed | Purchase Price | Minimum Term (months) | Monthly Rental | Total Obligation | Obligation/ Price Ratio |
|---|---|---|---|---|---|
| 7/18/68 | $62,148.00 | 12 | $2,500.00 | $30,000.00 | 48% |
| 7/22/68 | 34,213.00 | 12 | 1,350.00 | 17,200.00 | 47% |
| 8/2/68 | 45,610.00 | 12 | 1,500.00 | 18,000.00 | 40% |
| 8/14/68 | 45,610.00 | 12 | 1,500.00 | 18,000.00 | 40% |
| 8/15/68 | 28,317.00 | 12 | 1,000.00 | 12,000.00 | 42% |
| 8/15/68 | 74,500.00 | 12 | 2,500.00 | 30,000.00 | 40% |
| 8/16/68 | 79,540.00 | 12 | 2,500.00 | 30,000.00 | 38% |
| 8/19/68 | 79,540.00 | 12 | 2,500.00 | 30,000.00 | 38% |
| 8/30/68 | 16,000.00 | 3 | 900.00 | 2,700.00 | 17% |
| 10/16/68 | 47,415.00 | 2 | 1,750.00 | 3,500.00 | 7% |
| 1/10/69 | 47,415.00 | 12 | 1,500.00 | 18,000.00 | 38% |

| Date Contract Executed | Purchase Price | Minimum Term (months) | Monthly Rental | Total Obligation | Obligation/ Price Ratio |
|---|---|---|---|---|---|
| 1/15/69 | 66,630.00 | 15 | 2,500.00 | 37,500.00 | 56% |
| 1/16/69 | 26,073.00 | 12 | 900.00 | 10,800.00 | 41% |
| 1/24/69 | 66,630.00 | 15 | 2,500.00 | 37,500.00 | 56% |
| 2/5/69 | 39,823.00 | 6 | 2,000.00 | 12,000.00 | 30% |
| 6/30/69 | 32,505.00 | 12 | 1,000.00 | 12,000.00 | 37% |
| 7/2/69 | 12,500.00 | 6 | 1,250.00 | 7,500.00 | 60% |
| 7/10/69 | 66,605.00 | 12 | 2,500.00 | 30,000.00 | 45% |
| 7/10/69 | 66,605.00 | 12 | 2,500.00 | 30,000.00 | 45% |
| 9/2/69 | 67,603.00 | 12 | 2,500.00 | 30,000.00 | 44% |
| 10/11/69 | 45,000.00 | 3 | 2,250.00 | 6,750.00 | 15% |
| 10/24/69 | 84,219.00 | 3 | 4,250.00 | 12,750.00 | 15% |
| 12/9/69 | 69,707.00 | 6 | 2,500.00 | 15,000.00 | 22% |
| 12/15/69 | 84,046.00 | 6 | 3,000.00 | 18,000.00 | 21% |
| 2/26/70 | 12,000.00 | 1 | 1,000.00 | 1,000.00 | 8% |
| 7/3/70 | 29,032.00 | 1 | 1,500.00 | 1,500.00 | 5% |