838 F.2d 471
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
In re Nancy Sue PUCKETT; Barbara Guess Hampton; Ruby
Waller; Milton R. Harlan; and Vinnie Vinson, Debtors.
CONSUMERS LEASE NETWORK, INC., Plaintiff-Appellant,
v.
Nancy Sue PUCKETT; Barbara Guess Hampton; Ruby Waller;
Milton R. Harlan; Vinnie Vinson; and Henry E.
Hildebrand III, Trustee, Defendants-Appellees.
 No. 87-5398.
 United States Court of Appeals, Sixth Circuit.
 Feb. 1, 1988.
 
 Before MILBURN and RALPH B. GUY, Jr., Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Consumer Lease Network, Inc. (CLN) appeals from the district court's March 12, 1987 order affirming the bankruptcy court's decision which held that the agreements Nancy Sue Puckett, Barbara Guess Hampton, Ruby Waller, Milton R. Harlan, and Vinnie Vinson (debtor-appellees) entered into with CLN and Waterbed World, Inc. (Waterbed World),[1] are security agreements and not true leases and thereby denied the motions to compel debtor-appellees to assume or reject the agreements. For the following reasons, we affirm the district court's judgment.
 
 
 2
 CLN entered into at least one agreement to lease consumer goods with an option to buy with each debtor-appellee. Additionally, Waterbed World (using CLN's forms on which they had written "consumer lease network, CLN, Waterbed World, Inc. all are same in this contract") entered into two agreements to lease consumer goods with an option to buy with each debtor-appellee. Additionally, Waterbed World (using CLN's forms on which they had written "consumer least network, CLN, Waterbed World, Inc. all are same in this contract") entered into two agreements to lease consumer goods with an option to buy with debtor-appellee Puckett. Subsequently, each debtor-appellee filed a Chapter 13 bankruptcy petition.
 
 
 3
 The agreements were all treated as secured leases for the purposes of the proposed Chapter 13 plans. In each proposed plan other than Hampton's, debtor-appellee elected to assume the lease with CLN. The Hampton plan proposed to reject the lease. No debtor-appellee claimed the property described in the lease agreement executed by the debtor and CLN as exempt.
 
 
 4
 CLN filed objections to the confirmation of the proposed plans and motions to compel debtor-appellees to either accept or reject the existing lease contracts between CLN and each debtor-appellee. One typical objection states as a reason for not confirming the proposed plans that the trustee has neither elected to reject or accept the unexpired term of the lease of debtor-appellee with movant and therefore debtor-appellee's plan does not comply with 11 U.S.C. Sec. 1322(b)(7), nor has the trustee sought the bankruptcy court's approval of his election to either accept or reject the unexpired lease term as required by 11 U.S.C. Sec. 365(a). Debtor-appellee Puckett responded that the agreements which purport to be leases are in fact security agreements and should be so characterized by the court as leases intended for security, with the intent of the parties being that debtor-appellees would purchase the secured household goods from CLN.[2] Trustee Henry E. Hildebrand filed motions and requests for a hearing on behalf of debtor-appellees.
 
 
 5
 The cases were consolidated for trial before the bankruptcy court on this issue. The bankruptcy court heard the cases on September 26 and 27, 1985.
 
 
 6
 On April 21, 1986, the bankruptcy court filed an order which held that the agreements between debtor-appellees and lessors are security agreements and not true leases. Accordingly, the bankruptcy court denied the motions to compel debtor-appellees to assume or reject the leases and the objections to confirmation of the proposed plan were overruled.[3] A memorandum containing the bankruptcy court's findings of fact and conclusions of law and identifying this as a core proceeding was filed on the same date.
 
 
 7
 On motion of CLN, the bankruptcy court entered an order which among other things accepted the bond filed by CLN, granted CLN's motion for an expedited hearing, and ordered that all proceedings to enforce the April 21, 1986 order be stayed until further orders of the bankruptcy court or until any order of an appellate court disposing of these appeals became final.
 
 
 8
 CLN appealed the bankruptcy court's decision to the United States District Court for the Middle District of Tennessee. On March 12, 1987, the district court entered an order which affirmed the bankruptcy court's decision and a memorandum which adopted the bankruptcy court's decision in its entirety. On motion of CLN, the district court ordered that all proceedings to enforce its March 12, 1987 order be stayed upon the bond filed in the district court in connection with the stay of enforcement of the bankruptcy court order until further orders of the district court or until an order of the appellate court disposing of these appeals becomes final.
 
 
 9
 This timely appeal followed. The parties raise several issues on appeal, but the overriding issue in this case is whether the bankruptcy court erred in its characterization of these agreements as ones creating security interests.
 
 II.
 
 10
 The bankruptcy court identified this case as a core proceeding. See 28 U.S.C. Sec. 157(b)(2)(m). The bankruptcy court's findings of fact in a core proceeding must be upheld on review unless they are clearly erroneous. See In re Meyertech Corp., 831 F.2d 410, 418 (3d Cir.1987). In the instant case, the bankruptcy court weighed all of the evidence before it and concluded that the CLN transactions are not true leases but are disguised sales of goods with financing by CLN and reservation of rights consistent with a security interest. Before considering whether the bankruptcy court's findings of fact are clearly erroneous, we will consider whether the bankruptcy court applied the proper Tennessee law in determining how to characterize the agreements and whether the bankruptcy court erred in admitting parol evidence on the question of intent.
 
 
 11
 Appellant argues that although the bankruptcy court was correct in holding that state law controls the question of whether the agreements between debtor-appellees and CLN are true leases or leases intended as security interests, Tennessee's common law controls and that it was improper for the bankruptcy court to consider Tennessee's adoption of the Uniform Commercial Code (U.C.C.). Relying on United States Fidelity and Guaranty Company v. Thompson and Green Machinery Company, 568 S.W.2d 821, 825 (Tenn.1978) (decided before the passage of the 1978 Bankruptcy Reform Act), appellant argues that the bankruptcy court was restricted to considering state common law.
 
 
 12
 The Bankruptcy Code defines "security interest" as a "lien created by an agreement." 11 U.S.C. Sec. 101(45) (1982 & Supp. IV 1986). "Lien" is defined as a "charge against or interest in property to secure payment of a debt or performance of an obligation." 11 U.S.C. Sec. 101(33) (1982 & Supp. IV 1986). The legislative history of the Bankruptcy Reform Act of 1978 reveals that Congress intended for state or local law to control the issue of whether a certain transaction constitutes a lease or a security interest. S.Rep. No. 989, 95th Cong., 2d Sess. 26, reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5812; H.R.Rep. No. 585, 95th Cong., 1st Sess. 314, reprinted in 1978 U.S.Code Cong. & Admin.News 5963, 6271. The legislative history of the Bankruptcy Code further specifies, however, that all U.C.C. security interests and security agreements are security interests and security agreements under the federal Bankruptcy Code definitions of "security interest" and "security agreement." S.Rep. No. 989 at 26; H.R.Rep. No. 595 at 314.
 
 
 13
 This legislative history undermines appellant's argument that although the bankruptcy court was correct in holding that state law controlled the question of lease versus security interest, Tennessee common law controls and it was improper for the bankruptcy court to consider Tennessee's adoption of the U.C.C.. This is so, despite the following language in United States Fidelity and Guaranty Company:
 
 
 14
 In this case, however, we are not concerned with any provision of the Uniform Commercial Code regarding a "security interest"; instead, our concern is with liability under the contractor's surety bonds which, in turn, depends upon whether the construction equipment was leased from the plaintiff or purchased from him. Our issue is whether the "property" or "title" in the various machines was to pass to Gregory. Under our cases, supra, that is the issue upon which liability turns. The UCC does not contain the criteria for making that determination. See 67 Am.Jur.2d Sales Sec. 31 (1973). To find those criteria we must turn to the common law. The UCC definitions, according to their terms, are to be applied only in interpreting and administering the Uniform Commercial Code; they are not intended to apply universally, Parkridge Hospital, Inc. v. Woods, Commissioner, Tenn., 561 S.W.2d 754 (1978), and they certainly do not apply in a case such as this in which no provision of the UCC is invoked. We note, in passing, however, that there is no conflict apparent between the common law rules hereinafter applied and the UCC definition of "security interest" above quoted.
 
 
 15
 United States Fidelity and Guaranty Co., 568 S.W.2d at 825.
 
 
 16
 If there is a conflict between state and federal law on this issue,[4] the Supremacy Clause mandates that federal law controls. In this case, although the legislative history is not "law" it aids the court in statutory construction. A fair construction of the Bankruptcy Reform Act's definition of "security interest" recognizes that Congress intended for an agreement to be considered a security interest for the purpose of the Bankruptcy Reform Act if it is a security interest under the U.C.C. as adopted by the state whose substantive law controls. Since this is a proper construction of the federal law definition of "security interest," state law is irrelevant under the Supremacy Clause.
 
 
 17
 For this reason, we hold that the bankruptcy court did not err in considering Tennessee's adoption of the U.C.C. when evaluating the agreements to determine whether they constitute true leases or leases intended as security interests.
 
 
 18
 Appellant also argues that the bankruptcy court erred in admitting parol evidence on the question of intent, i.e., whether the parties intended to enter into true leases or security interests. Before reaching the question of whether the bankruptcy court properly admitted parol evidence, this court must determine whose parol evidence rule applies. The parol evidence rule is a rule of substantive law. 9 C. Wright & A. Miller, Federal Practice and Procedure, Sec. 2405 at 326 (1971). In the instant case, since state substantive law controls the question of lease versus security interest and since the parol evidence rule is a rule of substantive law, Tennessee law controls the parol evidence question as well.
 
 
 19
 In light of the U.C.C.'s instruction that "[w]hether a transaction creates a lease or security interest is determined by the facts of each case," U.C.C. Sec. 1-201(37), however, courts have been liberal in allowing parol evidence. See e.g., In re Holder & Northern Lumber Co., (B.Ct.M.D.Tenn.1982) (unpublished). Holder & Northern Lumber resolves the tension between the U.C.C.'s instruction with respect to characterizing security interests and the parol evidence rule by adopting a "common sense" rule under which evidence that explains "what the transaction is all about" is admissible. Similarly, White and Summers state that "... courts should allow a party to introduce parol evidence to show that a transaction in substance creates a security interest regardless of its form. The better view is that the entire transaction, and not just the lease agreement should be examined to determine whether a security interest was created." J. White and R. Summers, The Uniform Commercial Code Sec. 22-3 at 877 & n. 26 (2d ed 1980). In In re Walter Willis, Inc., 313 F.Supp. 1274 (N.D. Ohio 1970), aff'd on the opinion below, 440 F.2d 995 (6th Cir.1971), the district court expressly rejected the argument (made only as a straw argument by the court in that case) that the court's approach in viewing evidence outside of the lease violated the parol evidence rule. The court reasoned that Ohio Revised Code Annotated Sec. 1301.01(KK), a provision which is substantially similar to section 1-201(37) in all relevant respects, implies that facts within and without the lease must be viewed in ascertaining the intent of the parties to the transaction. Id. at 1278 n. 2.
 
 
 20
 Tennessee also has adopted a provision substantially similar to section 1-201(37). Tenn.Code Ann. Sec. 47-1-201(37). Section 47-1-201(37) states in relevant part as follows: "Whether a lease is intended as security is to be determined by the facts of each case." Like sections 1-201(37) and 1301.01(KK), section 47-1-201(37) requires that the entire transaction and not just the agreements be examined to determine whether a security interest was created. For this reason, the bankruptcy court properly admitted parol evidence of intent.
 
 
 21
 Finally, appellant argues that the bankruptcy court's findings of fact are clearly erroneous. Specifically, appellant contends that the bankruptcy court was clearly erroneous in failing to find that it was the parties' intention to enter into a true lease rather than a lease intended as a security agreement because Puckett and Waller expressly testified that it was their intent to lease and the other debtor-appellees testified to facts that clearly establish the intent of the parties to lease. Appellant contends that these leases were patterned after Form No. C-3-"Model Furniture Lease Disclosures," and that therefore, they must be true leases. Appellant also contends that the agreements constitute true leases because the lessees have the right to terminate the lease seventeen times without penalty and never have an obligation to go forward. Additionally, appellant contends that the bankruptcy court's finding that CLN does not have show rooms, storage facilities, warehouses, and delivery services is clearly erroneous because it denies the proposition of law that what one does through an agent he does himself.
 
 
 22
 As we have indicated, we apply the clearly erroneous standard of review.
 
 
 23
 '[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' ... 'In applying the clearly erroneous standard to the findings of a [trial] court sitting without a jury, appellates courts must constantly have in mind that their function is not to decide factual issues de novo.' If the [trial] court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.
 
 
 24
 Anderson v. Bessemer City, 470 U.S. 564, 573-74 (1985).
 
 
 25
 With respect to appellant's first contention, in fact, Puckett testified that she want to "lease to own." Waller testified that "I understood that I was leasing to buy. And, after a certain period of time, you know, on the lease period, it would be mine..." This testimony does not aid appellant since it is consistent with the bankruptcy court's finding that these were leases intended as security interests.
 
 
 26
 With respect to appellant's second contention, the agreements in question varied from Form No. C-3 in one important respect. The agreements provided for a nonrefundable security deposit. The bankruptcy court considered this security deposit to be a thinly disguised down payment. This conclusion is supported by the fact that the deposits were nonrefundable and by the fact that the deposits were not segregated, i.e., not kept in a separate account.
 
 
 27
 Appellant's third contention is probably based on the law journal article cited in this footnote from a Ninth Circuit case.
 
 
 28
 The theory which apparently underlies the decisions in these cases and which serves as the basis for [the] argument was articulated by Peter F. Coogan in Leases of Equipment and Some Other Unconventional Security Devices: An Analysis of UCC Section 1-201(37) and Article 9, 5 Duke Law Journal 909 (1973). Coogan maintains that the Uniform Commercial Code must be interpreted in light of pre-code law, specifically the Uniform Conditional Sales Act ("UCSA"). Since the USCA required that the purchaser be obligated to pay an amount substantially equal to the purchase price of the property before a transaction could be deemed a conditional sale, Coogan contends that before a lease can be subject to the provisions of Article 9 of the Uniform Commercial Code, the lessee must be obligated to pay in rent an amount substantially elquivalent to the designated purchase price of the property. When a lessee has the right to terminate a lease before making such an equivalent payment, as does [the lessee] in the instant case, he has not really assumed an obligation that would satisfy the requirements of the USCA. Thus, Coogan argues, a right to terminate by the lessee before an amount equivalent to the purchase price is paid should, for purposes of determining whether a lease is intended for security, outweigh the impact of an option to purchase for nominal consideration, leaving the agreement a "true" lease.
 
 
 29
 Although Coogan's theory has some historical appeal, we remain unpersuaded.
 
 
 30
 In re J.A. Thompson & Son, Inc., 665 F.2d 941, 946 n. 7 (9th Cir.1982).
 
 
 31
 Like the Ninth Circuit, we are unpersuaded by this line of reasoning. As the bankruptcy court stated, the argument that a termination clause negates the existence of a real obligation is unpersuasive where the customer's choice is to continue making payments or to forfeit substantial rights and interests in the collateral. The bankruptcy court noted that where the right to terminate involves a forfeiture, the option on paper cannot overcome the substance of the transaction: the termination option has simply been paid for by the debtor as part of the underlying sale.
 
 The bankruptcy court concluded:
 
 32
 On these facts, it would be particularly inappropriate to allow the termination clause to control characterization. CLN included the termination clause to maximize the probability that courts would find these contracts to be leases; but it has structured every other aspect of these transactions to overcome the possibility that its customers will terminate. Termination immediately works a dramatic forfeiture because of the substantial "nonrefundable security deposit." Coupled with this deposit, a CLN customer quickly makes such a substantial investment relative to the value of the underlying goods that the option to terminate becomes economic suicide. When a CLN customer contemplates termination, CLN talks the customer into deferral payments. The great majority of CLN customers come to understand the reality of the termination option and complete payments to avoid forfeiting property for which they have paid several times value.
 
 
 33
 As the bankruptcy court pointed out, because the transactions were structured to require large payments at the beginning of the contracts, economic realities forced the lessees to continue with payments and to exercise the options to buy or lose a great deal of money.
 
 
 34
 Appellant's fourth contention was not raised in the courts below. "Generally, questions not going to the jurisdiction of the trial court and not raised in the trial court will not be considered on appeal." Neu v. Grant, 548 F.2d 281, 287 (10th Cir.1977).
 
 
 35
 Based on the entire evidence, we are not left with the definite and firm conviction that a mistake has been committed. See Bessemer City, 470 U.S. at 573. Therefore, the bankruptcy court's findings of fact are not clearly erroneous.
 
 
 36
 For the foregoing reasons, we AFFIRM the district court's judgment.
 
 
 
 [1]
 Waterbed World was a plaintiff below, but did not appeal to this court
 
 
 [2]
 Appellant states in his brief that each debtor took the position that the agreement was not a true lease, but was a lease intended as security. (Appellant's brief at 4). Debtor-appellee Puckett's response was the only response included in the joint appendix
 
 
 [3]
 On January 6, 1986, an order entered by the bankruptcy court permitted debtors Puckett and Waller to voluntarily dismiss their Chapter 13 petitions. These parties were not dropped from the case because as to them the lease versus security interest question still impacted the handling of administrative expenses
 
 
 [4]
 We question whether a conflict between state and federal law actually exists because United States Fidelity and Guaranty Company was decided in the context of determining liability under a contractor's surety bonds, not in the context of a bankruptcy case