IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 13, 2003 Session

## MESSER GRIESHEIM INDUSTRIES, INC. D/B/A MG INDUSTRIES v. CRYOTECH OF KINGSPORT, INC., ET AL.

Appeal from the Circuit Court for Knox County
No. 3-64-97    Wheeler A. Rosenbalm, Judge

FILED JULY 10, 2003

No. E2002-01728-COA-R3-CV

This appeal from the Knox County Circuit Court questions whether the Trial Court erred in granting a summary judgment in favor of the Appellee/Defendant, Eastman Chemical Company, with respect to various claims connected with the purchase and sale of contaminated carbon dioxide by the Appellant/Plaintiff, Messer Griesheim Industries, Inc., d/b/a MG Industries. We affirm in part, vacate in part and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part and Vacated in Part; Cause Remanded**

HOUSTON M. GODDARD, P.J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and D. MICHAEL SWINEY, JJ., joined.

Gregory M. Leitner, Chattanooga, Tennessee; Mark G. Arnold, St. Louis, Missouri, and Arthur G. Seymour, Jr., Knoxville, Tennessee, for the Appellants, Messer Griesheim Industries, Inc. d/b/a MG Industries

Pamela Blass Bracher, Chattanooga, Tennessee; William Randall Wilson, Chattanooga, Tennessee, and Robert C. Divine, Chattanooga, Tennessee, for the Appellee, Eastman Chemical Company

## OPINION

Cryotech of Kingsport, Inc., (hereinafter "Cryotech") operates gas purification facilities and produces food grade liquid carbon dioxide. The Appellee, Eastman Chemical Corporation (hereinafter "Eastman"), owns and operates a coal gasification plant in Kingsport. The Appellant, Messer Griesheim, Inc., d/b/a MG Industries (hereinafter "Messer"), is a distributor of liquid carbon dioxide, which it purchases in bulk and sells to customers for various food and medical uses.

In 1988 Cryotech and Eastman entered into an agreement pursuant to which Cryotech would purchase a carbon dioxide rich waste stream (hereinafter "feedgas") from Eastman which Eastman had, prior to that time, vented into the atmosphere. The price paid to Eastman by Cryotech under the agreement was determined by the concentration of carbon dioxide in the feedgas and the volume of feedgas to be purchased was measured by the amount of carbon dioxide Cryotech shipped to its customers.

At the same time it entered the feedgas agreement Cryotech also entered into a lease of land belonging to Eastman adjacent to Eastman's Kingsport plant and constructed thereon a carbon dioxide purification facility.

Cryotech's purification facility became operational in 1992 and Cryotech began selling carbon dioxide to Messer and other customers. Shortly after operations began Cryotech began experiencing problems due to chemical contaminants in the feedgas it was purchasing from Eastman. In spring of 1993, Eastman discovered the presence of hydrogen cyanide (hereinafter "HCN"), a toxic and potentially lethal substance, on Cryotech's catalyst and informed Cryotech of this finding. The feedgas agreement had not included HCN in a description designated "Typical Composition of Carbon Dioxide Gas" and deposition testimony indicates that Eastman had previously represented that it had never detected any cyanide in the feedgas. Because of resulting increased purification costs, Cryotech withheld payment for the feedgas and eventually owed Eastman an arrearage of over one million dollars.

Cryotech began monitoring the HCN content of the feedgas more than once a day and frequently discussed the results of such monitoring with Eastman representatives. In late 1993 Cryotech detected increasing levels of HCN and complained to Eastman about the increased cost of its removal. Eastman sought to determine the cause of the increased HCN levels and endeavored to assist Cryotech in identifying better and less expensive ways Cryotech could remove the HCN. Eastman also took some actions in its own facility to try to reduce the HCN content of the feedgas. In 1996 Eastman installed its own HCN analyzer to prepare for compliance with new EPA regulations; however, this analyzer exhibited various problems and was ultimately determined to be an unreliable measure of HCN levels.

In March of 1996 Messer began selling carbon dioxide obtained from Cryotech to a large manufacturer of carbonated beverages. Shortly thereafter, this manufacturer notified Messer that it was receiving customer complaints regarding the odor and/or taste of its beverages. Testing revealed the presence of HCN in Cryotech's carbon dioxide and thereafter Eastman discontinued supplying feedgas to Cyotech. Subsequently, several of Messer's other customers claimed that their product had been adulterated by the contaminated carbon dioxide and that beverage canisters containing the contaminated carbon dioxide were rendered unusable and had to be destroyed. Messer settled these claims in anticipation of litigation. Messer also incurred expenses in cleaning its own storage tanks and tanker cars which had contained the contaminated carbon dioxide. Messer incurred additional expenses as a result of the adulteration of uncontaminated carbon dioxide when it was mixed with carbon dioxide purchased from Cryotech. Altogether, Messer asserts that it has sustained damages

totaling nearly eight million dollars as a result of injury to its own property and the property of its customers and that it has suffered additional damages "including but not limited to, business losses, substantial attorney's fees, expenses incurred in determining the origin of the hydrogen cyanide contamination, and the costs of cover." There are no allegations of personal injury in this case.

In June of 1996 Messer filed a complaint in the United States District Court for the Eastern District of Tennessee at Chattanooga against Cryotech seeking reimbursement of funds paid to satisfy claims of those customers of Messer who had purchased contaminated carbon dioxide. The complaint was amended in September of 1996 to include as defendants Eastman and Mellon Financial Services which provided financing for Cryotech's gas purification facility.[1]

On February 4, 1997, Messer filed a complaint in the Circuit Court for Knox County which essentially duplicated the complaint filed in the District Court. The complaint alleged that the defendants were liable under theories of breach of contract, fraud, breach of warranty, misrepresentation, products liability, ultra-hazardous activity, negligence, gross negligence, recklessness, outrageous conduct, intentional concealment, violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and violations of the Consumer Product Safety Act. This complaint was removed to the United States District Court for the Eastern District of Tennessee at Knoxville where it was consolidated with the federal suit pending in Chattanooga. The District Court in Knoxville dismissed Messer's claims for violation of the Consumer Product Safety Act and the RICO Act and remanded the case to the Knox County Circuit Court.

In July of 1997 Eastman filed a motion to dismiss and for summary judgment or partial summary judgment in the Circuit Court. Hearing on that motion was held on October 6, 1997, at which time the Court granted the motion in part. In so doing, the Court dismissed Messer's product liability claim upon a finding that Messer had not sustained property damage. The Court also dismissed Messer's claim for breach of contract upon a finding that there was lack of privity between Eastman and Messer and Messer's claim for breach of warranty for lack of privity and/or property damage. Finally, the Court dismissed Messer's claim for violation of the TCPA.[2] Remaining matters under the motion were held in abeyance pending further discovery.

In October of 2001, Messer filed a motion requesting the Court to reconsider its October 1997 ruling granting Eastman's motion for summary judgment and, on January 15, 2002, Eastman filed a renewed motion for summary judgment requesting that the Court dismiss all remaining claims against it.

---

[1]On October 8, 1999, the Circuit Court granted Mellon's motion for summary judgment and that ruling was subsequently affirmed by this Court in *Messer Griesheim v. Cryotech of Kingsport,* 45 S.W.3d 588 (Tenn. Ct App. 2001). Additionally, all claims against Cryotech were dismissed with prejudice by agreed order entered November 26, 2001.

[2] On December 10, 1997, the Circuit Court also dismissed Messer's claims alleging violations of the Federal Consumer Products Safety Act and the RICO Act because those claims were previously dismissed with prejudice by the District Court in Chattanooga.

On April 18, 2002, the Court granted Eastman's renewed motion for summary judgment. The Court also granted Messer's motion to reconsider with respect to its claim against Eastman under the Tennessee Consumer Protection Act; however, on May 13, 2002, the Court granted Eastman's motion for summary judgment as to this claim also. Thereafter, Messer filed this appeal.

The issues presented for our review in this case are restated as follows:

1. Did the Circuit Court err in granting Eastman's motion for summary judgment as to Messer's tort claims upon grounds that such claims are barred by the economic loss doctrine?

2. Did the Circuit Court err in granting Eastman's motion for summary judgment as to Messer's fraud and concealment claims upon grounds that such claims are barred by the economic loss doctrine?

3. Did the Circuit Court err in granting Eastman's motion for summary judgment as to Messer's claim under the Tennessee Consumer Protection Act upon grounds that there was lack of privity between Eastman and Messer, that there was lack of evidence that Eastman engaged in unfair or deceptive conduct and that there was lack of evidence of causation?

4. Did the Circuit Court err in granting Eastman's motion for summary judgment as to Messer's tort and contract claims upon grounds that Eastman and Messer were not engaged in a joint venture?

5. Should the Circuit Court have applied Pennsylvania law in ruling upon Eastman's motion for summary judgment as to Messer's claims against Eastman for breach of warranty?

The standard of review with respect to a trial court's ruling on a motion for summary judgment is well settled. Summary judgment is only proper when the moving party has demonstrated that there are no genuine issues with respect to the material facts relevant to the claim or defense contained in the motion and the moving party is entitled to judgment as a matter of law. *Byrd v. Hall,* 847 S.W.2d 208, (Tenn. 1993). Because our inquiry in determining the propriety of a summary judgment involves purely a question of law no presumption of correctness attaches to the trial court's judgment. *Hunter v. Brown*, 955 S.W.2d 49 (Tenn. 1997). In assessing evidence in the summary judgment context we must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor and a summary judgment should be granted only when the facts and the conclusions to be drawn from the facts permit a reasonable person to reach only one conclusion. *Byrd*, *ibid.*

The first issue we address is whether the Circuit Court properly granted Eastman's motion for summary judgment as to Messer's tort claims upon grounds that such claims were barred by the economic loss doctrine.

The Tennessee Supreme Court has noted that "Tennessee has joined those jurisdictions which hold that product liability claims resulting in pure economic loss can be better resolved on theories other than negligence." *Ritter v. Custom Chemicides, Inc.*, 912 S.W.2d 128 (Tenn. 1995). The economic loss doctrine provides that "[i]n a contract for the sale of goods where the only damages alleged come under the heading of economic losses, the rights and obligations of the buyer and seller are governed exclusively by the contract." *Trinity Industries v. McKinnon Bridge Co.*, 77 S.W.3d 159 (Tenn. Ct. App. 2001). Consequently, a plaintiff may not maintain a claim for purely economic losses absent contractual privity with the party charged with responsibility for those losses. However, T.C.A. 29-34-104 provides as follows as to causes of action which do not involve purely economic losses:

> In all causes of action for personal injury or property damage brought on account of negligence, strict liability or breach of warranty, including actions brought under the provisions of the Uniform Commercial Code, privity shall not be a requirement to maintain such action.

In the case before us there was no contractual privity between Eastman and Messer. The Circuit Court found that the losses claimed by Messer were economic losses and, based upon the economic loss doctrine, the Court dismissed Messer's tort claims against Eastman. However, Messer contends that it asserted claims for property damage and that it's tort claims should be allowed pursuant to T.C.A. 29-34-104. Specifically, Messer contends that tank cars it used for shipping were damaged as a result of contact with the contaminated carbon dioxide and that, when it placed the contaminated carbon dioxide in storage tanks, it damaged the tanks' pipes as well as the uncontaminated carbon dioxide in the tanks with which it was mixed. Messer further contends that property damage was also incurred when its customers combined the contaminated carbon dioxide with soft drink ingredients in beverage cans ruining both the ingredients and the cans. Messer argues that because of this asserted property damage it should be allowed to pursue its tort claims under T.C.A. 29-34-104. In addition to seeking damages to its own property Messer seeks recovery for damages to the property of its customers through subrogation or, alternatively, through contribution.

Eastman argues that the only losses incurred by Messer were economic losses. Eastman asserts that the money paid by Messer to its customers was paid solely because the carbon dioxide sold by Messer to these customers did not meet the customers' commercial expectations. Accordingly, Eastman argues that these payments constitute economic loss for which Eastman is not liable because it is not in privity with either Messer or Messer's customers. Eastman contends that Messer's only remedies are those which it may have against Cryotech.

Each party cites two United States Supreme Court cases in support of its position - *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 106 S.Ct. 2295 (1986) and *Saratoga Fishing Co. v. J.M. Martinac & Co.*, 117 S.Ct. 1783 (1997).

In *East River* the plaintiffs chartered four oil-transporting supertankers. While at sea, the turbines on each of the ships malfunctioned because of design and manufacturing defects. No harm resulted other than to the turbines themselves. The plaintiffs filed suit in tort against the manufacturer of the turbines and the issue before the Court was whether a cause of action in tort is stated when a defective product injures only itself. The Court concluded that a plaintiff cannot recover in tort for physical damage to a defective product itself and that, in such cases, remedies are limited to those available under contract. The Court stated as follows at page 2302:

> Damage to a product itself is most naturally understood as a warranty claim. Such damage means simply that the product has not met the customer's expectations, or, in other words, that the customer has received "insufficient product value." ... The maintenance of product value and quality is precisely the purpose of express and implied warranties.... Therefore, a claim of a nonworking product can be brought as a breach-of-warranty action. Or, if the customer prefers, it can reject the product or revoke its acceptance and sue for breach of contract.... (Citations omitted.)

In *Saratoga*, another admiralty case, the plaintiff's fishing vessel sank as a result of an engine room fire caused by a defective hydraulic system installed by the defendant boat manufacturer. The original purchaser of the vessel had added a skiff, a seine net and miscellaneous spare parts and these were all incorporated into the vessel when it was resold to the plaintiff and were destroyed when it sank. The Supreme Court noted that under its prior holding in *East River*, although a plaintiff cannot recover in tort for physical damage a defective product causes to itself, a plaintiff can recover for physical damage the defective product causes to other property. The issue in *Saratoga* was whether the added equipment - the skiff, seine net, etc.- was part of the "product itself" or "other property" for which the plaintiff could recover. The Court found that "[w]hen a manufacturer places an item in the stream of commerce by selling it to an Initial User, that item is the 'product itself'" and "equipment added to a product after the Manufacturer (or distributor selling in the initial distribution chain) has sold the product to an Initial User is not part of the product that itself caused physical harm. Rather, in *East River's* language, it is 'other property'."

Eastman argues that in the instant case the soft drinks were an integrated product and the carbon dioxide was a component of that product. Eastman contends that when the component was found to be defective the injury was to the product itself - the soft drinks- and proper recovery is through contract. Eastman references the Court's quotation of *East River* at page 1788 of *Saratoga*:

> "Since all but the very simplest of machines have component parts, [a contrary] holding would require a finding of 'property damage' in virtually every case where a product damages itself. Such a holding would eliminate the distinction between warranty and strict products liability."

We do not find that this statement is supportive of Eastman's contention that the damaged soft drinks were the product itself of which the carbon dioxide was a component. The quoted

language was prompted by the plaintiff's allegations in *East River* that each turbine was damaged by defectively designed components. The Court noted that "[s]ince each turbine was supplied by [the manufacturer] as an integrated package, ... each is properly regarded as a single unit." In the case before us the soft drink was not an integrated unit supplied by Eastman. In the language of the Court in *Saratoga* the soft drink was not the item placed in the stream of commerce by Eastman.

Eastman cites *McCrary v. Kelly Tech. Coating, Inc.*, an unreported opinion of this court filed in Knoxville on August 28, 1985. In *McCrary* the plaintiff, a swimming pool contractor who painted pools as part of his job, painted a pool with paint manufactured by the defendant. Because of defects in the paint the plaintiff was required to repaint the pool. Thereafter, the plaintiff filed suit against the defendant for the cost of repainting. This court determined that the cost of repainting was a cost of repair and, therefore, an economic loss. Accordingly, the plaintiff was precluded from recovering from the defendant because there was no privity between the two. In arriving at this conclusion we noted the following language from White & Summers, *Uniform Commercial Code*, § 11-4 (2nd Ed. 1980) (quoting from Restatement Second, Torts § 402A (1965):

> [W]e use the terms "property damage" on the one hand and "economic loss" on the other to describe different kinds of damage a plaintiff may suffer. An action brought to recover damages for inadequate value, costs of repair, and replacement of defective goods or consequent loss of profits is one for "economic loss." Property damage, on the other hand, is the *Restatement's* physical harm ... to [user's] property.

We do not find that our holding in *McCrary* bars recovery for at least a portion of the damage alleged by Messer in the case at hand. We concluded our opinion in *McCrary* by noting that there was no evidence that the component (the paint) caused physical damage to the end product (the swimming pool). In the case before us there is evidence that the component (the carbon dioxide) did cause damage to the end product (separate property of Messer and its customers).

In further support of its argument that the losses suffered by Messer are not losses attributable to property damage, Eastman cites *Trinity Industries, Inc. v. McKinnon Bridge Co.*, 77 S.W.3d 159 (Tenn. Ct. App. 2001). Under the facts in *Trinity,* defective structural steel used in the construction of a bridge caused the bridge to collapse and the steel's manufacturer was sued for "the damage to the steel itself and the attendant costs of salvage, storage, and testing." We determined that these damages constituted economic loss rather than property damage. In our discussion of the economic loss doctrine in *Trinity* we noted that, although Tennessee does not have definitive body of law on the doctrine, most courts in other jurisdictions "hold that there is tort liability for the sale of goods only when there is either personal injury or damage to 'other property' which was not a part of the contract for sale" Eastman relies on the following footnote to this statement:

> There is a difference of opinion as to what constitutes "other property" to which, when injury incurs, can be the basis of a negligence cause of action. We think that the interpretation of "other property" which is most true to the policy behind the

rule does not include the type of property that one would reasonably expect to be injured as a direct consequence of the failure of the defective product, as these losses are essentially damages for failed commercial expectations, or loss of the benefit of the bargain.

Based upon this footnote Eastman argues that the ruination of the described property of Messer and Messer's customers does not constitute injury to "other property" because, as Eastman states in its brief, "[t]he most obvious consequence of a noncompliance with [contractual specifications for food grade carbon dioxide] would be ruination of any food or drink product into which the [carbon dioxide] was combined and recall and destruction of those products."

Although Eastman's argument is supported by the statement set forth in the referenced footnote, that statement is *obiter dictum* and as such, does not constitute binding precedential authority under the doctrine of *stare decisis*. *Shepherd Fleets, Inc. v. Opryland USA*, 759 S.W.2d 914 ( Tenn. Ct. App. 1988). In any event, we deem the statement to be overly broad and we agree with Messer's contention that if all property that one would reasonably expect to be injured because of the defective product is excluded from the definition of "other property" this would result in a remote buyer never being able to recover from a manufacturer for property damage in tort. This would be so because proximate cause is a prerequisite to such recovery. *King v. Danek Medical, Inc.*, 37 S.W.3d 429 (Tenn. Ct. App. 2000). The establishment of proximate cause is contingent upon a showing that the harm giving rise to the cause of action was reasonably forseeable. *McClenahan v. Cooley*, 806 S.W. 2d 767 (Tenn. 1991). Therefore, under the dictum cited by Eastman, by establishing proximate cause, the plaintiff in a tort action against a manufacturer would necessarily eliminate its damaged property from the category of "other property" and would, thereby, undermine its case.

Guided by the Supreme Court's holding in *Saratoga,* we are compelled to conclude that the contaminated feedgas, as the product placed in the stream of commerce by Eastman, was "the product itself " and the property of Messer and its customers which was injured as a result of contact with the contaminated carbon dioxide was "other property." Messer is not required to establish privity to maintain its cause of action in tort for damages arising from injury to this other property and the Trial Court erred in granting summary judgment against Messer on that basis. It is our determination that Messer's carbon dioxide which was contaminated as a result of being mixed with the contaminated carbon dioxide constitutes such injured property. We also find that the soft drink ingredients and cans of Messer's customers which were ruined as a result of contact with the contaminated carbon dioxide fall within this category. We do not, however, agree that the cost incurred by Messer in cleaning its tanker cars and storage tanks is properly classified as a cost related to property damage. In *McCrary* we determined that the costs of repainting the pool, including the cost of removing the defective paint, was a cost of repair and, therefore, an economic loss. We find no basis for distinguishing between the cost of cleaning defective paint from the surface of a pool and the costs incurred by Messer in cleaning its tanker cars and storage tanks. In this regard we note the following testimony of David Wolff, a witness for Messer, referenced by Messer in its brief:

Q. To your knowledge, were any cylinders or tankers or storage tanks rendered not usable because of this HCN situation?

A. I'm not aware of any cylinders, tankers or storage tanks which were rendered permanently unusable. They needed to be cleaned properly so that they registered no presence of HCN.

The next two issues are whether summary judgment was appropriate with respect to Messer's fraud claim and whether summary judgment was appropriate with respect to the claim asserted by Messer under the TCPA . We find it appropriate to address these two issues as one because we believe that our analysis of the record regarding Messer's allegations of misrepresentation and concealment will resolve both issues.

Specifically, Eastman asserts that it made no representations of any kind to Messer and has not deceived Messer or anyone else. Eastman points out that, under the feedgas agreement, it contracted with Cryotech to sell it raw feedgas for purification and that Cryotech contemplated that the feedgas contained HCN as a constituent. Eastman further maintains that the feedgas agreement with Cryotech disclaimed any representations about the merchantability or fitness of the feedgas, expressly contemplated that the constituents of the feedgas might change over time and specifically permitted Cryotech to terminate the agreement if the impurities in the feedgas reached a level at which Cryotech could no longer process the gas. Eastman also notes that when it found HCN on Cryotech's catalyst it immediately notified Cryotech. Finally, Eastman avers that there is no evidence that Cryotech knowingly failed to remove impurities from the carbon dioxide it sold to Messer or that Eastman knew of any such failure.

Messer argues that Eastman engaged in deceptive activity when it placed a defective product in the stream of commerce knowing that it would damage Messer and failed to disclose this to Messer. Messer contends that Eastman knew that its feedgas was contaminated with HCN throughout the term of the feedgas agreement, that Eastman knew that on occasion the concentrations of HCN exceeded levels of 30 parts per million and that Eastman's own doctor testified that he would start being concerned for human safety at concentrations over that amount. Messer further argues that Eastman knew or should have known that the Cryotech facility was incapable of removing HCN at those levels and that it was, therefore, inevitable that the carbon dioxide sold by Cryotech would contain HCN. Finally, Messer states that Eastman knew that Cryotech was selling Messer carbon dioxide and that this carbon dioxide would be resold for human consumption and, yet, Eastman never informed Messer that the carbon dioxide it purchased from Cryotech would contain HCN.

The foodgas agreement between Cryotech and Eastman expressly acknowledges that Eastman is generating crude carbon dioxide which, "in its raw form, is not suitable for food use" and that Cryotech "proposes to construct and operate a facility for the purification and liquefaction" of such carbon dioxide. The product which Cryotech was in the business of selling and producing was food grade carbon dioxide. The product sold by Eastman to Cryotech was *non-food grade* carbon dioxide

-9-

There is no evidence that Eastman ever represented to Cryotech, Messer or anyone else that the product it was selling to Cryotech was fit for human consumption.

In response to Eastman's argument that it was merely supplying a raw material that Cryotech alone was responsible for purifying, Messer states that "Eastman's own documents evidence its intent that the Eastman carbon dioxide be 'refined and put in product form' for delivery to Cryotech as a 'food grade carbon dioxide feed stock,'...after which 'Cryotech further purifies the gas'."

The documents referred to by Messer consist of two internal memoranda generated by Eastman. We do not agree that a jury could reasonably conclude from the information referenced in these documents that Eastman represented that it was supplying, or intended to supply, anything other than non-food grade carbon dioxide. The phrase "food grade carbon dioxide feed stock" is derived from an Eastman memorandum the subject of which is designated "Approval for Product Commercialization for Carbon Dioxide Coproduct" and appears as follows in that document:

> Proposal: It is proposed that a coproduct carbon dioxide rich stream be made in Acid Division and provided to Cryotech as a food grade carbon dioxide feedstock.

The only reasonable construction of this sentence, given the language of the feedgas agreement that the carbon dioxide produced by Eastman is non- food grade, is that the words "food grade carbon dioxide" do not describe the grade of the feedstock but instead describe the product for which the "carbon dioxide rich stream" is to serve as feedstock or raw material. The words "refined and put in product form" appear in an attachment to the same memorandum designated "Manufacturing Attachment" in the following context:

> 1. Equipment and Capacity
> The carbon dioxide is produced in the Plant 12 Gasifiers. The CO2 is refined and put in product form in Plant 14. The capacity is approximately 550 tons of CO2 per day. Utilization is expected to be about 225 tons CO2 per day.

There is nothing in this language in its original context which could be construed as evidence that Eastman is producing carbon dioxide fit for human consumption or making that representation.

Finally, the words "Cryotech further purifies the gas" appear in a separate Eastman memorandum, the designated subject of which is "Trace Impurities in Carbon Dioxide CoProduct" and the original context is as follows:

> The Gasification department is currently revising the MSDS for carbon dioxide coproduct (PM 14324). This gas is sold to a company called Cryotech which further purifies the gas and sells the carbon dioxide to carbonate beverages.

The implication that the carbon dioxide was purified by Eastman because it is "further" purified by Cryotech does not constitute proof that the carbon dioxide is produced by Eastman to be of food grade quality or that Eastman represents it to be such when it is sold to Cryotech.

As Messer concedes in its brief, Tennessee law requires reliance in misrepresentation cases. *Milwee v. Peachtree Cypress Inv. Co.*, 510 F. Supp. 284 (E. D. Tenn. 1978). However, Messer contends that such reliance need not be direct reliance, citing *Ladd v. Honda Motor Co.*, Ltd., 939 S.W.2d 83 ( Tenn. Ct. App. 1996).

In *Ladd* a twelve year old plaintiff was paralyzed as the result of injuries he incurred while operating an all-terrain vehicle manufactured by the defendant. The vehicle was owned by the plaintiff's uncle who had allowed the plaintiff to operate it. The uncle testified that he had believed that his nephew could safely operate the vehicle because of television advertising by the defendant which depicted children operating all-terrain vehicles. The Court noted the requirement under section 402B of the Restatement (Second) of Torts that a consumer must justifiably rely upon a defendant's misrepresentation before liability will arise. The Court found that "the reliance required by Section 402(B) need not be that of the injured consumer but may be that of the purchaser who passes the product along to the ultimate consumer." Accordingly, Messer indicates that it need not have directly relied upon misrepresentations by Eastman.

In *Ladd* the plaintiff's uncle reasonably relied upon misrepresentations in the defendant's advertising in allowing the plaintiff to operate the vehicle. However, in the instant matter it cannot be said that Cryotech reasonably relied upon any misrepresentation by Eastman in marketing carbon dioxide to Messer. As noted above, Eastman never represented that the product it sold to Cryotech was anything other than non-food grade carbon dioxide. Furthermore, Messer cannot have relied upon a misrepresentation by Eastman that the feedgas sold to Cryotech did not contain HCN because, when the alleged injuries occurred to Messer in 1996, Cryotech was well aware that HCN was a constituent of the feedgas, having been informed of this fact by Eastman in 1993.

It is our conclusion that Messer has failed to submit evidence which creates a genuine issue of material fact as to whether it reasonably relied upon a misrepresentation by Eastman and, therefore, summary judgment dismissal of its cause of action for fraud is appropriate.

This Court has hitherto held that a plaintiff under the TCPA is not required to show reliance upon a misrepresentation by the defendant in order to maintain a cause of action. *Harvey v. Ford Motor Credit Company*, an unreported opinion of this Court filed in Knoxville on July 13, 1999. However, there must be a deceptive act by the defendant before the defendant can be held liable under the TCPA. *McDonald's Corp. v. Shop At Home, Inc.*, 82 F. Supp.2d 801 (M.D. Tenn. 2000). Our analysis of the record in this case, as set forth above, compels us to the conclusion that Messer has failed to establish a genuine issue of material fact as to whether Eastman engaged in a deceptive act which would subject it to liability under the TCPA Accordingly, summary judgment was also appropriate as to Messer's TCPA claim.

-11-

The next issue we address is whether Messer presented evidence establishing a genuine issue of material fact as to whether Eastman and Cryotech were engaged in an implied partnership or joint venture. Messer asserts that, as a joint venturer with Cryotech, Eastman is jointly and severally liable for Messer's tort and contract claims against Cryotech because Cryotech and Messer were in privity.

As defined by T.C.A. 61-1-202(a) a partnership is "the association of two or more persons to carry on as co-owners of a business for profit...." Joint ventures and partnerships are governed by the same rules. *Federated Stores Realty, Inc. v. Huddleston*, 852 S.W.2d 206 (Tenn. 1992). Although similar to a partnership, a joint venture exists for a more limited time and for a more limited purpose. *Fain v. O'Connell*, 909 S.W.2d 790 (Tenn. 1995).

In *Bass v. Bass*, 814 S.W.2d 38 (Tenn. 1991) the Tennessee Supreme Court noted as follows at page 41:

> In determining whether one is a partner, no one fact or circumstance may be pointed to as a conclusive test, but each case must be decided upon consideration of all relevant facts, actions and conduct of the parties.... If the parties' business brings them within the scope of a joint business undertaking for mutual profit – that is to say if they place money, assets, labor, or skill in commerce with the understanding that profits will be shared between them – the result is a partnership whether or not the parties understood that it would be so....
>
> Moreover, the existence of a partnership depends upon the intention of the parties, and the controlling intention in this regard is that ascertainable from the acts of the parties.... Although a contract of partnership, either express or implied, is essential to the creation of partnership status, it is not essential that the parties actually intend to become partners.... The existence of a partnership is not a question of the parties' undisclosed intention or even the terminology they use to describe their relationship, nor is it necessary that the parties have an understanding of the legal effect of their acts.... It is the intent to do the things which constitute a partnership that determines whether individuals are partners, regardless if it is their purpose to create or avoid the relationship.... Stated another way, the existence of a partnership may be implied from the circumstances where it appears that the individuals involved have entered into a business relationship for profit, combining their property, labor, skill, experience, or money. (Citations omitted.)

The Trial Court found that "Cryotech and Eastman did not have the right to control each other's means and methods of doing business or general business activities, and therefore, these parties were not partners or joint venturers." Messer contends that the Trial Court's ruling was in error, arguing that there was evidence that Eastman would share profits with Cryotech and did, in fact, share losses with Cryotech and that this alone establishes a *prima facie* case of joint venture.

-12-

Messer additionally asserts that there was evidence of a substantial community of interest between Eastman and Cryotech which permits an inference that Eastman had a right of control. And finally, Messer asserts that there was direct evidence that Eastman had a right of control.

Eastman contends that Messer submitted the same argument, both factually and legally, regarding an alleged joint venture between Mellon, Cryotech and Eastman in *Messer Griesheim v. Cryotech of Kingsport*, 45 S.W.3d 588 ( Tenn. Ct. App. 2001). In that case we determined that " the fact that each of the defendants expected to profit from the relationship does not mean that they expected to share the profits of Cryotech's business." Accordingly, we found that Mellon was not involved in a joint venture or partnership with Cryotech and Eastman. Eastman argues that, based upon that determination *Messer*, we should also find that there was no joint venture/implied partnership in the case now before us. We disagree.

Our determination that there was no joint venture/implied partnership between Mellon and the other two defendants in *Messer* was based upon Mellon's status as a secured creditor and we found that the actions of Mellon referenced by Messer to establish a joint venture/implied partnership were nothing more than measures taken by Mellon as the financing lessor of the Cryotech facility to preserve its security interest. Although some of the evidence presented by Messer to establish a joint venture/implied partnership in the present matter is not dissimilar to that presented in the earlier case, the relationship between Eastman and Cryotech is not that of a secured creditor and debtor. The relationship between Eastman and Cryotech is governed by a totally different agreement and is properly subject to a separate and different analysis.

Before a partnership may be implied the circumstances must show that the parties intended to share the profits from their joint enterprise. *Wright v. Quillen*, 909 S.W.2d 804 (Tenn. Ct. App. 1995), citing *Pritchett v. Thomas Plater & Co.,* 232 S.W. 961 (1921). Accordingly, absent evidence showing an intent by Eastman and Cryotech to share profits we must affirm the judgment of the Trial Court that there was no genuine issue of material fact in this case with respect to the existence of a joint venture or implied partnership.

Messer points out this Court's recognition in *Messer* that "... Cryotech's profits and Eastman's profits seem to be somehow linked to one another...." Although that statement does appear as *dicta* in *Messer*, we did not in any way indicate in that case that Cryotech and Eastman were sharing, or intended to share, profits.

With respect to its assertion that Eastman would have shared profits with Cryotech, Messer notes that, under the terms of the feedgas agreement, Cryotech paid Eastman for the feedgas based upon the amount of carbon dioxide Cryotech shipped to customers and the price that Cryotech charged those customers. "If Cryotech's price to [Messer] increased by 5%, Eastman was entitled to a 5% increase in the price it charged Cryotech." Messer contends that a jury could reasonably conclude that this pricing mechanism amounted to a sharing of profits.

Messer relies upon the case of *Memphis Natural Gas Co. v. Pope*, 161 S.W.2d 211 (Tenn. 1941), in support of its contention that a jury could conclude that Eastman and Cryotech were engaged in an agreement to share profits.

In *Memphis Natural Gas Co.,* the Tennessee Supreme Court found that a joint venture existed between a natural gas company and a power company. Under the facts of that case the gas company and the power company were both organized in 1928 for the purpose of bringing natural gas from gas fields in Louisiana to certain areas of Tennessee. The gas company owned and operated pipe lines which conveyed the gas from Louisiana to stations owned and operated by the power company from which it was distributed to the power station's customers. Each party employed its own workers and made its own purchase of materials. At least eighty per cent of the gas company's revenues consisted of monies derived from its business with the power company.

Under the terms of the contract between the gas company and power company the parties were required to deliver, each to the other, a monthly statement setting forth costs of operation and maintenance, taxes incurred, amortization costs, gross revenues realized and the amount of net surplus or net deficit for the contract year. The contract further provided that the combined net surpluses and net deficits of the parties be equally divided between them by an annual cash adjustment and by adjustment of the rates charged by the gas company to the power company "in order as nearly as possible to effect an equal division of any contemplated combined surplus and/or deficit for the contract year then current and for subsequent contract years." Finally, the contract provided that if in any year all the net deficits of both parties were made up and, in addition, the power company had received from combined net surpluses an amount equal to one and one-half per cent of certain investment expenses for every contract year to date then the entire balance of the combined net surplus would be paid to or retained by the gas company.

Our Supreme Court noted in *Memphis Natural Gas Co.,* that the sharing of profits of a business is *prima facie* evidence of partnership and that "even without joint control of the operations that produce profits, persons or corporations may establish relationships that will result in a sharing of profits, each with the other." The Court found that the above described contractual provisions set forth a mathematical formula whereby the parties could calculate profits after each was given specified credits and that profits from the entire enterprise were divided between them. The Court noted that under the final provision described above the gas company was not only a participant in the profits from distribution of gas by the power company but that, after a certain situation was reached, the gas company would receive all the remaining profits of the distribution.

Messer correctly points out that in *Memphis Natural Gas Co.,* the Court found that "[t]he price of gas, if there was ever an actual sale, was not and could not be determined until after the gas had been delivered to the ultimate consumer." However, the Court's determination that there was a joint venture was not based upon this finding. The gas company's complaint in *Memphis Natural Gas Co.,* sought to enjoin the collection of excise taxes collectible on intrastate commerce. The gas company asserted that the gas was sold at a fixed price to the power company and delivered in the direct flow of interstate commerce. The question before the Court, therefore, was whether the parties

were engaged in a joint operation at the time the gas was distributed to customers in Tennessee, in which case the gas company would be engaged in intrastate, rather than interstate, commerce and would, therefore, be subject to the tax. The question of when the price of the gas became fixed was raised in relevance to a determination of whether the gas was, as asserted by the gas company, sold at a fixed rate and then delivered to the power company in interstate commerce before intrastate distribution. However, the Court opined at pages 215-216 that the question of when title to the gas passed was not important in view of the fact that the parties were engaged in a joint operation:

> It is not necessary to determine when title to the gas passed to Memphis Power and Light Company, or whether the title ever actually passed. If title passed, then, still the business conducted in distributing to consumers was for and on behalf of both these development and operating corporations, and Memphis Natural Gas Company was engaged through its co-operative in intrastate business in Tennessee.

> The price of gas, if ever there was an actual sale, was not and could not be determined until after the gas had been delivered to the ultimate consumer. Our view is, that there is not a fixed price in article sixth which is merely adjusted by article eleventh, but in reality there was an operation in which both companies were jointly interested. There was an allotment of work performed but a division of the entire results of that work.

While the Court recognized that the price of the gas was not determinable until after delivery to the customer, its conclusion that the gas company and power company were engaged in a joint venture was not based upon that fact but rather upon a finding that the contractual provisions discussed above constituted an agreement to share profits and losses.

We are further compelled to point out the distinction between profits and gross revenues. Tennessee case law has defined profit to mean the net amount after deduction of proper expenses incident to the business. *Jones v. Davidson*, 34 Tenn. 447 (1854). We do not agree that a reasonable jury could conclude that the pricing mechanism whereby the price received by Eastman for its feedgas increased in proportion to the price Cryotech charged when selling the carbon dioxide it processed was a device to share profits. Even if this pricing mechanism were conceived to be an arrangement for sharing funds received those funds would constitute gross returns not profits and, unlike the sharing of profits, the sharing of gross returns does not of itself establish a partnership. T.C.A. 61-1-202(b)(2). Messer's argument that the pricing mechanism constitutes evidence that Eastman and Cryotech intended to share profits is without merit.

Messer has failed to present evidence that Cryotech and Eastman intended to share profits and has, therefore, failed to establish a genuine issue of material fact as to whether those parties were engaged in a joint venture or implied partnership. Accordingly, the Trial Court's summary judgment with respect to this issue is affirmed.

The final issue we address is whether the Trial Court erroneously dismissed Messer's breach of warranty claim based upon the fact that there is no privity between Messer and Eastman. Messer argues that the Trial Court should have applied Pennsylvania law and that under *Moscatiello v. Pittsburgh Contractors Equipment Co.*, 595 A2d 1198 (Pa. Super. 1991), even absent privity, a manufacturer can be held liable for economic losses as well as property damage resulting from a defective product. Eastman apparently does not dispute this construction of *Moscatiello*.

Messer asserts that the HCN in the carbon dioxide supplied by Cryotech caused it to be non-conforming to express and implied specifications set forth in supply agreements entered into between Messer and Cryotech and resulted in a breach of express and implied warranties in those agreements. Messer also asserts that the HCN in Eastman's feedgas gave rise to breach of warranty claims by Cryotech against Eastman. Although there is privity between Eastman and Cryotech and between Cryotech and Messer, there is no privity between Messer and Eastman. However, as previously indicated in this opinion, we have found that a portion of the damages alleged by Messer arise from injury to property. Messer is entitled to pursue its claim for property damage under a breach of warranty theory in Tennessee even in the absence of privity. T.C.A. 29-34-104 and *Commercial Truck & Trailer Sales v. McCampbell,* 580 S.W.2d 765 (Tenn. 1979).[3] But Tennessee law does not allow recovery of economic losses under a breach of warranty theory absent privity and, unless we determine that Pennsylvania law, rather than Tennessee law, applies to Messer's breach of warranty claims we must affirm the Trial Court's summary judgment to the extent those claims seek recovery for economic losses.

Messer asserts, and the record confirms, that it was sold the contaminated carbon dioxide pursuant to supply agreements it entered into with Cryotech and that those agreements provide that they shall be governed by Pennsylvania law, citing *Vantage Technology, LLC v. Cross*, 17 S.W.3d 637 (Tenn. Ct. App. 1999). Messer argues that, since Messer and Cryotech chose Pennsylvania law to govern their supply agreements, Pennsylvania law should govern its warranty claims against Eastman notwithstanding the fact that such claims were filed in Tennessee. Messer also cites T.C.A. 47-1-105 in support of this argument apparently relying on subsection (1) of that statute which states as follows:

> (1) Except as provided hereafter in this section, when a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or such other state or nation shall govern their rights and duties....

In *Vantage* this Court found that a provision in a covenant not to compete between the plaintiff employer and the defendant employee was a valid choice of law clause calling for the

---

[3]Although Eastman contends that, prior to this appeal, Messer did not raise the issue of whether Tennessee law allows it to recover property damages for breach of warranty even in the absence of privity, the record shows that Messer did raise this issue at trial in its September 22, 1997, response to Eastman's motion to dismiss and motion for summary judgment or partial summary judgment

application of Tennessee law. However, in that case both plaintiff and defendant were parties to the agreement containing the choice of law provision. In the instant matter Eastman was not a party to the supply agreements entered into between Messer and Cryotech and, therefore, the described choice of law provision does not merit a finding that Pennsylvania law governs Messer's warranty actions against Eastman. Messer presents no authority for the argument that the agreements entered into between itself and Cryotech are determinative of the proper law to be applied in Messer's warranty claims against Eastman.

Messer further contends that it is otherwise appropriate that the law of Pennsylvania govern in this case because that is where both Messer and Cryotech are headquartered and that is where Cryotech executed the feedgas agreement with Eastman. Messer also asserts that Pennsylvania law should apply because it sustained at least a portion of its damages in Pennsylvania, referencing witness testimony that the carbon dioxide purchased from Cryotech was placed in a storage tank at Messer's terminal in Philadelphia where it was mixed with carbon dioxide from other suppliers, indicating that that is where Messer's storage tank and other carbon dioxide were contaminated due to contact with the contaminated product purchased from Cryotech. Messer also states that it has consistently asserted that Pennsylvania law applies, that it pleaded claims in its amended complaint under Pennsylvania law and that Eastman did not specifically contest the application of Pennsylvania law in its answer to that complaint. However, Messer fails to cite authority for the proposition that any of these factors dictates that Pennsylvania law should be applied in this case and, accordingly, its argument that Pennsylvania law applies based upon each of these factors may be deemed to be waived. Failure to cite authority for propositions in arguments submitted on appeal constitutes waiver of the issue. *State v. Brown*, 795 S.W.2d 689 (Tenn. Cr. App. 1990) and *Rhea County v. Town of Graysville*, an unreported opinion of this Court filed in Knoxville on July 25, 2002. However, even in light of these factors referenced by Messer, we do not agree that the record supports Messer's argument that Pennsylvania law should be applied in this case.

In *Hataway v. McKinley,* 830 S.W.2d 53 (Tenn. 1992), our Supreme Court abandoned the *lex loci delecti* doctrine which required that the substantive rights of an injured party in a tort case be determined according to the law of the state where the injury occurred. In its place the Court adopted the "most significant relationship" approach of the Restatement (Second) of Conflict of Laws. At page 59 the Court cites §145 of the Restatement which provides under subsection (2) that the following contacts are to be taken into account in determining the law applicable to an issue:

> (a) the place where the injury occurred,
> (b) the place where the conduct causing the injury occurred,
> (c) the domicile, residence, nationality, place of incorporation and place of business of the parties,
> (d) the place where the relationship, if any, between the parties is centered.

In *Vantage, ibid.* at page 650 we set forth Tennessee's conflict of law doctrine applicable to contractual claims as follows:

-17-

Tennessee follows the rule of *lex loci contractus*. This rule provides that a contract is presumed to be governed by the law of the jurisdiction in which it was executed absent a contrary intent. *Ohio Cas. Ins. Co. v. Travelers Indem. Co.,* 493 S.W.2d 465, 467 (Tenn. 1973).

If the parties manifest an intent to instead apply the laws of another jurisdiction, then that intent will be honored provided certain requirements are met. The choice of law provision must be executed in good faith. *Goodwin Bro.s Leasing, Inc. v. H & B Inc.,* 597 S.W.2d 303, 306 (Tenn. 1980). The jurisdiction whose law is chosen must bear a material connection to the transaction. *Id.* The basis for the choice of another jurisdiction's law must be reasonable and not merely a sham or subterfuge. *Id.* Finally, the parties' choice of another jurisdiction's law must not be "contrary to 'a fundamental policy' of a state having [a] 'materially greater interest' and whose law would otherwise govern." *Id.*, n. 2 (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2) (1971).

Whether Messer's claims are analyzed under the conflict of law doctrine applicable to matters arising in tort or that applicable to matters arising in contract, it is our determination that Tennessee law should govern this case. The feedgas containing HCN was produced at Eastman's factory in Tennessee and Eastman performed its duties under the feedgas agreement in Tennessee, thus the actions/omissions attributed to Eastman by Messer would appear to have taken place in Tennessee. The feedgas was supplied to Cryotech at Cryotech's facility in Tennessee. Cryotech processed the feedgas received from Eastman in Tennessee and delivered the contaminated carbon dioxide to Messer in Tennessee. Finally, the feedgas agreement between Eastman and Cryotech provides that that agreement "shall be governed and construed according to the laws of the State of Tennessee." Under these circumstances we believe it is appropriate to apply Tennessee law in this case and Messer's argument for the application of Pennsylvania law is without merit.

For the foregoing reasons we affirm in part, vacate in part and remand for further action consistent with our decision herein. Costs of appeal are adjudged equally against Messer and Eastman.

_____
HOUSTON M. GODDARD, PRESIDING JUDGE