**GOODWIN BROTHERS LEASING, INC.,
Plaintiff-Appellant,**

v.

**H & B INCORPORATED et al.,
Defendants-Appellees.**

Supreme Court of Tennessee.

March 24, 1980.

Rehearing Denied April 21, 1980.

S. Ralph Gordon, H. Frederick Humbracht, William W. Earthman, III, Mary A. Calvani, Nashville, for plaintiff-appellant.

Robert L. Trentham, Nashville, for defendants-appellees.

## OPINION

HARBISON, Justice.

Appellant, a Kentucky corporation, filed this action to collect a balance claimed under a contract dated August 27, 1974, between it and H & B Incorporated, a Tennessee corporation. Also joined as defendants were six individuals who had personally guaranteed the obligations of the corporate debtor under the contract. Both the Chancellor and the Court of Appeals held that the transaction, although in form a sale and leaseback of equipment, was in essence a secured loan made by appellant to H & B at a usurious rate of interest. Appellant was allowed recovery of the principal of the loan and interest at the rate allowed by Tennessee law.

The contract expressly provided that the rights and obligations of the parties would be governed by the law of Kentucky, in which appellant was domiciled and in which all payments under the contract were required to be made. Both the Chancellor and the Court of Appeals held, however, that Tennessee law governed the transaction, despite the agreement of the parties, and that the contractual provision calling for application of Kentucky law would not be enforced because it was inserted for the purpose of evading the Tennessee usury laws. The parties apparently agree that the contract, whether a lease or a loan, is valid and enforceable if governed by the

law of Kentucky. At least, no claim of invalidity thereunder has been suggested.

Because of the importance of the issue in interstate commercial and financial transactions, we granted appellant's application for permission to appeal.

There is little, if any, dispute among the parties as to the material facts. The execution of the contract and of the individual guaranties was stipulated at trial, as were the amounts paid by H & B to appellant. There is no question but that appellees are sophisticated, knowledgeable, businessmen. Each of the individual guarantors is engaged in a number of corporate ventures and each is experienced in corporate financing. This is not a case of the victimizing of an uninformed consumer by an avaricious finance company. Whether the transaction amounted to a lease or a loan of money, it involved hundreds of thousands of dollars; it was negotiated at arms length; and there is not the slightest evidence in the record of fraud, deception, misleading or misunderstanding among any of the parties as to the nature of what they were doing.

H & B Incorporated was a fairly new venture, chartered in 1972. Its principal officers and shareholders were the guarantors, all of whom were interested in a number of building, construction and other commercial ventures. The officer who conducted the negotiations with appellant, Mr. Clifford E. Hooper, testified that H & B had purchased several pieces of heavy construction and earth-moving equipment on conditional sales contracts. Because of the economic recession in 1974, it was having difficulty in meeting its monthly payments on this machinery. It sought restructured financing in order to pay its vendors and to spread its obligations over a longer period of time and in smaller monthly installments. Mr. Hooper negotiated with several lenders, such as Associates Finance and C.I.T. He found that they were demanding interest on borrowed money from fourteen to nineteen percent.

In the past Mr. Hooper had had two sale-leaseback transactions with appellant, which, according to the uncontradicted testimony, is engaged in a general leasing business. Primarily it leases automobiles and equipment. It sometimes purchases this equipment itself and leases it, but in most instances it purchases equipment from or on the account of a customer and leases it to the customer. Generally appellant borrows funds for this purpose, and, of course, it expects to lease the equipment for a rental which will yield a profit. In the present case, it borrowed funds in Indiana, secured by appellees' contract, to finance the transaction with appellees.

Because of his acquaintance with appellant, Mr. Hooper discussed with its Nashville representatives the financial needs of H & B. They submitted a written proposal to the home office of appellant, and Mr. Hooper discussed the proposed transaction with an official at appellant's principal office in Kentucky. Terms were ultimately agreed upon. The transaction was closed through appellant's attorney in Nashville and the loan proceeds were disbursed there. Each of the guarantors was a resident of Tennessee, and all equipment covered by the transaction was located in this state.

The agreement between the parties was embodied in printed forms which were used nationwide by appellant in the leasing of equipment. Under the terms of the arrangement H & B agreed to transfer to appellant a substantial amount of construction equipment and related personal property and then lease it back for a term of forty-eight months at a rental payable in equal monthly installments. No bill of sale was actually executed from appellee to appellant. The parties executed and appellant filed a U.C.C. financing statement indicating its security interest in the listed equipment. The obligations of H & B were secured not only by individual guaranties but by an irrevocable letter of credit issued by a Nashville bank.

The corporate debtor made monthly payments required by the contract for almost two years and then defaulted. During the latter part of that time it experienced difficulty in meeting the payment schedule. One of its officials went to Kentucky and

negotiated a temporary modification with appellant's officials, cutting the payments in half for a few months. There is no question but that such a modification had to be authorized at appellant's principal office and that none of its local representatives had such authority.

As is frequently true in situations such as this, there was evidence which would have justified a trier of fact in concluding that the transaction was either a lease or a loan. It was carried on the books of H & B as a lease, and that company purported to deduct the monthly rental payments for tax purposes. At some point, however, it was apparently audited and a question was raised by the Internal Revenue Service whether the transaction should be treated as a lease or a loan of money.[1]

Because the transaction had indicia of both a loan and of a sale and leaseback, this Court is bound by concurrent findings of fact made by the Chancellor and the Court of Appeals that its essence was that of a loan of money at an effective rate of interest of 18.5% per annum. There is also material evidence in the record to support the findings of the courts below that the provision making Kentucky law applicable was inserted, in part, for the purpose of enabling appellant to take advantage of the higher interest rates permitted in that state.

Based upon these findings of fact, the Chancellor concluded as a matter of law that the stipulation for application of Kentucky law "was for the purpose of evading the usury laws of Tennessee and was not

entered into in good faith." The Court of Appeals concurred, finding that "the significant contacts" of the transaction were overwhelmingly with Tennessee. It stated that the only significant contact with Kentucky was that appellant was domesticated there. It overlooked, however, the fact that all payments under the contract were required to be made and were in fact made to appellant at its principal office in Kentucky. The Court of Appeals stated:

"All the parties involved in this case were very knowledgeable in the business world; neither the officers of the corporate plaintiff nor the officers of the corporate defendant were novices in financial dealings. All parties were aware of the usury laws of Tennessee."

There is material evidence to support all of these findings, but, as previously stated, there is not the slightest evidence of any fraud, chicanery, or misleading of either party by the other.

Both courts below recognized the settled law of Tennessee that parties ordinarily are free to contract that the law of some jurisdiction other than that of the place of making will govern their relationship. In previous cases such a stipulation has been sustained when made in good faith and when the other state had some material connection with the transaction. This has usually been construed to mean that the other state must have some direct and relevant connection with the transaction and that the choice of its law was not merely a sham or subterfuge.[2] The fact, however,

1. In the recent case of *United States Fidelity and Guaranty Co. v. Thompson & Green Machinery Co.*, 568 S.W.2d 821 (Tenn.1978), there was a dispute between parties as to whether a transaction involving heavy equipment constituted a conditional sale or a lease. Apropos of the situation in the present case, the Court observed there:

"The accounting methods employed by each of the parties with respect to the rental payments made by Gregory and the listing of the machinery in question as inventory may be considered to be more indicative of the hope of the parties to minimize federal income taxes than of the true nature of the transactions between them. The inferences,

if any, to be drawn from these accounting methods cancelled out each other, Gregory's being consistent with leases and Thompson and Green's being consistent with conditional sales." 568 S.W.2d at 826.

2. *See Restatement (Second) of Conflict of Laws* § 187(2) (choice of law by parties will be upheld unless state chosen has "no substantial relationship" to them or their transaction and there is "no other reasonable basis" for their choice; or unless application of foreign law would be contrary to "a fundamental policy" of a state having "materially greater interest," and whose law would otherwise govern).

that parties intend to permit one or the other to take advantage of a higher interest rate and thereby to avoid a local limit on interest does not necessarily constitute bad faith or invalidate the transaction.

Closely in point is the case of *Seeman v. Philadelphia Warehouse Co.*, 274 U.S. 403, 47 S.Ct. 626, 71 L.Ed. 1123 (1927). There a Pennsylvania lender, through a series of complex discounted notes, lent credit to a New York borrower at a rate of interest which was valid under Pennsylvania law but usurious in New York. Although the formal documents governing the transaction were dated at Philadelphia, preliminary negotiations had been conducted in New York City. The proceeds of the loan were forwarded to the borrower in New York. In that case, as in the present case, it was concluded by the trier of fact that the transaction was a loan of money, thinly disguised as a loan or sale of credit.

The Supreme Court of the United States found it immaterial whether the contract was entered into in New York or Pennsylvania. It said:

"Respondent, a Pennsylvania corporation having its place of business in Philadelphia, could legitimately lend funds outside the state and stipulate for repayment in Pennsylvania in accordance with its laws, and at the rate of interest there lawful, even though the agreement for the loan were entered into in another state, where a different law and a different rate of interest prevailed." 274 U.S. at 407, 47 S.Ct. at 627.

The Court referred to a general principle that parties may stipulate for higher interest in the place of performance without incurring penalties for usury, so long as they do so in good faith. The requirement of "good faith," however, was discussed by the Court as follows:

"A qualification of these rules, as sometimes stated, is that the parties must act in good faith, and that the form of the transaction must not 'disguise its real

character.' [citation omitted]. As thus stated, the qualification, if taken too literally, would destroy the rules themselves, for they obviously are to be invoked only to save the contract from the operation of the usury laws of the one jurisdiction or the other. The effect of the qualification is merely to prevent the evasion or avoidance at will of the usury law otherwise applicable, by the parties' entering into the contract or stipulating for its performance at a place which has no normal relation to the transaction and as to whose law they would not otherwise be subject." 274 U.S. at 408, 47 S.Ct. at 628.

In that case the Court sustained the transaction, stating:

"Here respondent, organized and conducting its business in Pennsylvania, was subject to the laws of that state, and had a legitimate interest in seeking their benefit. The loan contract, which stipulated for repayment there, and which thus chose that law as governing its validity, cannot be condemned as an evasion of the law of New York, which might otherwise be deemed applicable." 274 U.S. at 408–09, 47 S.Ct. at 628.

The principles of the *Seeman* case, *supra*, have since been embodied in the Uniform Commercial Code, which was enacted in Tennessee in 1963. As pertinent here, it provides:

"Except as provided hereafter in this section, when a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties." T.C.A. § 47–1–105(1).[3]

The leading Tennessee cases dealing with choice of law by parties were decided several years prior to the adoption of the Uniform Commercial Code, but are consistent with its provisions. *Stevenson v. Lima Lo-*

---

**3.** For exposition of the term "reasonable relation" *see* Annot., 63 A.L.R.3d 341 (1975); *see also* Official Comments to the section of the

U.C.C. cited above, in which the *Seeman* case is specifically referred to.

*comotive Works*, 180 Tenn. 137, 172 S.W.2d 812 (1943); *Hubble v. Morristown Land & Improvement Co.*, 95 Tenn. 585, 32 S.W. 965 (1895).[4]

Also decided before the adoption of the foregoing statute were the leading Tennessee cases dealing with usury in interstate transactions. *See Deaton v. Vise*, 186 Tenn. 364, 210 S.W.2d 665 (1948); *Bowman v. Price*, 143 Tenn. 366, 226 S.W. 210 (1920). The transactions involved in each of those cases were sustained. The *Seeman* case, *supra*, was cited with approval by this Court in *Deaton v. Vise*, 186 Tenn. at 375, 210 S.W.2d 665.

In the Tennessee cases decided before the adoption of the Uniform Commercial Code, choice of law by contract was limited by the requirement of "good faith." As pointed out above, however, in the *Seeman* case bad faith in this context was construed to mean the invocation of the law of a jurisdiction which had "no normal relation" to the transaction and to whose law the parties would not otherwise be subject. The "good faith" requirement has now been distilled by statute into a requirement that foreign law must have a "reasonable relation" to the transaction.

It is undisputed in the present case that appellant has its principal office in Kentucky and that it enters into transactions similar to that involved here throughout the United States. One of its officials testified that the stipulation regarding Kentucky law was inserted into the contract intentionally and not merely as a matter of form. There is no countervailing evidence, nor do appellees plead ignorance of this provision of the contract.

■ It is clear that both the corporate appellee and the guarantors knew and expected that if they were in fact borrowing money, rather than leasing equipment, they would have to pay interest on a large commercial loan such as this at a rate greater than that permitted by local law and that they would have to obtain their funds out of state. Mr. Hooper was acquainted with officials of appellant in its home office with whom he had dealt on previous occasions. It was these officials, not the local representatives of appellant, who ultimately had to approve or disapprove the transaction and to agree upon its terms and conditions. Under these circumstances we find that the stipulation of the parties that Kentucky law govern was valid, was knowingly entered into, and was relevant to the transaction. That it may have incidentally involved the avoidance of local laws governing the rate of interest does not, as noted above, make the stipulation either irrelevant or invalid. Kentucky was the place of performance by appellees as well as the state of appellant's principal office, both of which are important "contacts" in effective choice of law. *Restatement (Second) of Conflict of Laws* §§ 6, 188(2).

■ Tennessee, like many other states, has long recognized a choice of law principle unique in usury cases that parties are presumed to have chosen that law which will uphold the legality of their bargain. That law which will lend greatest validity to the transaction will be applied if it is otherwise logically relevant. *See Deaton v. Vise*, 186 Tenn. at 372, 375, 210 S.W.2d 665; 14 *Williston on Contracts* § 1698C (3d ed., W. Jaeger, 1972); *Restatement (Second) of Conflict of Laws* § 203.

This principle is now embodied in recent state statutes dealing with conflicting interest rates. T.C.A. § 47–14–119 provides:

"In any transaction otherwise subject to this chapter which is not subject to the disclosure requirements of the Federal Consumer Credit Protection Act, where the transaction bears a reasonable relationship to this state and also to another

---

4. In *Bedford v. Eastern Bldg. & Loan Ass'n*, 181 U.S. 227, 21 S.Ct. 597, 45 L.Ed. 834 (1901), the Supreme Court of the United States noted that Tennessee did not prohibit contracts making applicable the laws of another state. There a loan to Tennessee residents by a New York lender at rates in excess of those permitted under Tennessee law was sustained. *See also Pioneer Savings & Loan Co. v. Cannon*, 96 Tenn. 599, 36 S.W. 386 (1896) (sustaining loan in Tennessee at rates applicable in Minnesota).

state or nation, the parties may agree in the written contract evidencing such transaction that the laws of this state or of any other state or nation shall govern their rights and duties with respect to interest, loan charges, commitment fees and brokerage commissions."

This 1979 statute was not in force at the time of the transaction under consideration here. However its terms are similar to T.C.A. § 47–1–105 of the U.C.C. quoted above. We consider that the public policy of the state, as reflected in the U.C.C. and in previous decisions of this Court, was at that time consistent with this later specific statute.

Another recent statute alluded to in the briefs of the parties was Tennessee Public Acts 1976, Chapter 844, (T.C.A. § 47–14–105), which expressly permitted a contractual choice of law respecting loans made by nonresidents in the principal amount of $100,000 or more. This statute has since been repealed and absorbed into the more general statute enacted in 1979. The 1976 statute also was not in force at the time of the transaction involved here. Again, however, it is an indication of the legislative expression of public policy permitting rather free choice of law by contracting parties in complex and sophisticated financial transactions.

The existence of a network of conflicting and restrictive usury laws throughout the United States has long posed a major problem for the economy of the nation. *See* Note, *Usury Legislation—Its Effects on the Economy and a Proposal for Reform*, 33 *Vand.L.Rev.* 199 (1980). Despite this fact, it is unlikely that states will de-regulate interest rates or permit them to float entirely with the law of supply and demand. Tennessee has regulated such rates since statehood. *Cumberland Capital Corp. v. Patty*, 556 S.W.2d 516 (Tenn.1977). Indeed, it probably would be undesirable that there be a complete lack of regulation of the subject of usury and of lending charges and practices. Nevertheless, especially in the field of corporate finance, large interstate transactions such as that involved here are

an essential part of the nation's economy. We are of the opinion that local usury laws should not be permitted to restrict the free choice of applicable foreign law where that law has direct relevance and pertinence to the parties and to their transaction.

The judgment of the courts below are reversed and this cause is remanded to the Chancery Court for reconsideration and redetermination in light of our holding that the transaction between the parties, even though a loan, was properly attributable to the law of Kentucky by choice of the parties and is governed thereby. Costs incident to the appeal are taxed to appellees; all other costs will be fixed by the Chancellor.

BROCK, C. J., and FONES, COOPER and HENRY, JJ., concur.

## ORDER ON PETITION FOR REHEARING

HARBISON, Justice.

■ A thoughtful and careful petition for rehearing has been filed on behalf of appellees. The principal insistence made therein is that the choice-of-law principles stated in the original opinion should not be applied because the lender had domesticated its charter in Tennessee. Although not referred to in the original opinion, this contention was not overlooked but was carefully considered. We are of the opinion that the domestication of appellant's charter does not lead to or require a different result in view of the undisputed fact that its principal office was at all times in Kentucky, the indebtedness was to be repaid in that state, and the terms and conditions of the loan were originally made, approved and subsequently modified by officials of appellant at its Lexington office.

Accordingly the petition for rehearing is overruled at the cost of appellees.

BROCK, C. J., and FONES, COOPER and HENRY, JJ., concur.