NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0563n.06
Filed: August 4, 2006

No(s) 05-5590/5592

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| CURTIS 1000, INC., | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellee*, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE MIDDLE |
| v. | ) | DISTRICT OF TENNESSEE |
| | ) | |
| **GEORGE B. MARTIN, DAVID L. BEAN,** and | ) | **O P I N I O N** |
| **AMERICAN BUSINESS FORMS,** d/b/a/ | ) | |
| **AMERICAN SOLUTIONS FOR BUSINESS, INC.,** | ) | |
| | ) | |
| *Defendants-Appellants*. | ) | |

BEFORE:    DAUGHTREY and COLE, Circuit Judges; GRAHAM, District Judge.[*]

**R. GUY COLE, JR., Circuit Judge.**  Defendants-Appellants George B. Martin, David L.

Bean, and American Business Forms d/b/a American Solutions for Business, Inc. ("ASB") appeal

a preliminary injunction entered against them and in favor of Plaintiff-Appellee Curtis 1000, Inc.

("Curtis 1000").  In the district court, Curtis 1000 sought injunctive relief against Martin and Bean

for breaching restrictive covenants contained in their employment agreements, and against ASB for

procurement of breach of contract and intentional interference with Martin's and Bean's contracts.

The district court granted the requested preliminary injunctions.  It is from the granting of injunctive

---

[*]The Honorable James L. Graham, Senior United States District Judge for the Southern
District of Ohio, sitting by designation.

relief that the defendants appeal. Additionally, the defendants seek certification of a question to the Supreme Court of Georgia.

For the following reasons we **REVERSE** the district court's grant of a preliminary injunction against Martin, **AFFIRM** the district court's grant of a preliminary injunction against Bean, **REVERSE** the district court's grant of a preliminary injunction against ASB insofar as that injunction relates to ASB's relationship with Martin, **AFFIRM** the district court's grant of a preliminary injunction against ASB insofar as that injunction relates to ASB's relationship with Bean, and **REMAND** to the district court for proceedings consistent with our opinion. Further, we **DENY** the defendants' motion to certify a question to the Supreme Court of Georgia.

## I.

Curtis 1000 sells custom-printed products through sales representatives who are assigned to specific geographic territories. Curtis 1000 markets items it manufactures as well as items manufactured by other companies. As a direct competitor to Curtis 1000, ASB sells similar products through sales representatives. These sales representatives, however, are not limited to a geographic area. ASB is not in the manufacturing business; therefore, it fills customer orders solely through other vendors.

Martin and Bean were both hired by Curtis 1000 in 1984 as sales representatives and were assigned different sales territories in Central Tennessee. Throughout their employment, Martin and Bean received training at Curtis 1000's corporate office in Atlanta, Georgia. The training included issues of confidentiality of Curtis 1000 customer information and document retention and

destruction. Martin and Bean were both responsible for building their own client bases, and Curtis 1000 did not reimburse either of them for ordinary business expenses they incurred.

Martin and Bean both signed agreements with Curtis 1000, which contained restrictive covenants that would apply if either resigned. Bean's agreement was executed on June 22, 1984, and specified that it was governed by the laws of Delaware. In pertinent part it reads:

> (a) . . . [T]he Sales Representative will acquire by reason of his employment valuable information concerning the Company's accounts, customers . . ., business methods, procedures, and techniques. Any and all such information other than known generally by persons not affiliated or formerly affiliated with the Company is to be treated by the Sales Representative as "Confidential Information." The Sales Representative agrees that he will not, for a period of two years immediately following the termination of his employment, disclose any Confidential Information, in whole or in part, directly or indirectly, to any person or persons not employed by the Company at the time of disclosure.
>
> . . .
>
> (d) . . . [T]he Sales Representative hereby expressly covenants and agrees . . . that he will not, in the territory assigned to him . . . for a period of two years immediately following the termination of his employment, directly or indirectly, either solely for his own benefit or for the benefit of another, as that person's agent, employee, partner, or joint venturer;
>
> (i) solicit, or provide assistance to another in the taking or soliciting of orders for printing, envelopes, business forms or other products marketed by the Company and which Sales Representative was authorized to sell, from any customer account to which the Sales Representative or the Company made one or more sales during the two years immediately preceding the termination of Sales Representative's employment and on whom Sales Representative called for the purpose of soliciting business for the Company;
>
> (ii) call upon or assist another in calling upon any customer account to whom the Sales Representative or Company made one or more sales during the two years immediately preceding the termination of Sales Representative's employment and on whom the Sales Representative called for the purpose of soliciting business for the Company, for the purpose of selling or soliciting the sale of any product which

is the same or similar to those products marketed or sold by the Company which the Sales Representative was authorized to sell while employed by the Company;

(iii) solicit, or provide assistance to another in the taking or soliciting of, orders for printing, envelopes, business forms or other products marketed by the Company and which Sales Representative was authorized to sell, from any customer account "followed" by the Sales Representative . . . on whom Sales Representative called, within the two years immediately preceding the termination of Sales Representative's employment, for the purpose of soliciting business for the Company.

Martin's agreement was executed on February 21, 1991, and specified that it was governed by the laws of Georgia. In pertinent part it reads:

B. The Sales Representative agrees that he will not, during his employment with the Company and during the Relevant Time Period (a) use, in any way detrimental to the interests of the Company, for his own benefit or the benefit of any other person or entity, or (b) disclose, in whole or in part, directly or indirectly, to any person not employed by the Company, any Trade Secrets or Confidential Information.

C. The Sales Representative agrees that he will <u>not</u>, in the territory and with respect to the Accounts assigned to him, during the Relevant Time Period, directly or indirectly, either solely for his own benefit or for the benefit of another as that person's agent, employee, partner, or joint venturer;

(i) solicit or call upon or communicate with by any means, or provide assistance to any other person or entity in soliciting or calling upon or communicating with by any means, any Customer Account for the purpose of selling or attempting to sell or soliciting orders for any product that is one of the Company's Products or that is substantially similar to or competitive with any of the Company's Products; or

(ii) actually effect the sale to any Customer Account of, or accept any order from any Customer Account for, any product that is one of the Company's Products or that is substantially similar to or competitive with any of the Company's Products.

Martin and Bean became dissatisfied with Curtis 1000 by 2004. In May 2004, Martin contacted ASB about entering its employ. In June 2004, Bean likewise contacted ASB. At the respective times they contacted ASB, both Martin and Bean remained employed by Curtis 1000.

In June 2004, Martin traveled to ASB's Minnesota office at ASB's expense to attend a "Discover American" day, in which ASB provided information to him, among other potential ASB salespeople, about how ASB operated. In August 2004, Bean likewise attended a "Discover American" day. In August 2004, Martin and Bean participated in an ASB sales meeting. Both Martin and Bean's primary contact at ASB was Craig McLain. While recruiting and then hiring Martin and Bean, McLain was aware that Martin and Bean worked for, and that they had non-competition agreements with, Curtis 1000.

In September 2004, Martin and Bean resigned from Curtis 1000. Curtis 1000 presented evidence that the sales representative who replaced Bean observed Bean calling upon former Curtis 1000 customers shortly after he resigned. The sales representative who replace Martin testified that he learned that Martin was also calling on his former customers.

Additionally, shortly after Martin and Bean resigned, former Curtis 1000 customers began "shifting their inventory" from Curtis 1000's warehouse to another location. According to Curtis 1000, transfer of inventory is almost always an indication that the customer is moving its business to a competing company.

## A. Additional Facts Surrounding Bean's Resignation From Curtis 1000

The district court found the following facts regarding Bean's contact with Curtis 1000 customers:

> Some of Bean's former customers who did not know he had left Curtis 1000 called him on his cell phone. He informed them [that] he had resigned from Curtis 1000. When they asked what they should do about placing orders, Bean told them to contact Curtis 1000. One customer sent him an order by fax. He contacted the customer and instructed her to call the 1-800 number on his business card to contact Curtis 1000. Bean did not volunteer any information about his association with

- 5 -

ASB. If the customers asked where he was working, he told them he worked from ASB and said nothing more. If the customers asked what kind of products ASB sells, Bean told them [that] ASB is a print brokerage firm. If they asked if Bean could call on them, he told them he could not because of his non-solicitation agreement with Curtis 1000. Some customers replied that Bean was not soliciting their business, they wanted him to continue to serve as their sales representative, and they would buy products from ASB. Bean told such customers that they must make their requests to him in writing. Some of the customers provided him with letters asking to continue to do business with him, and once he received those letters, he continued to call on the customers as usual. . . . Bean did not hear from many of his former Curtis 1000 customers. He denied providing any Curtis 1000 customer lists to ASB.

Bean admits that he had this contact; further, he concedes that his agreement with Curtis 1000 stated he could not call upon or assist another in calling upon his former customers and that he could not provide assistance to another in the taking or soliciting of orders from customers.

## B. Procedural Background

On November 9, 2004, Curtis 1000 filed this diversity action against Martin, Bean and ASB. In addition to monetary damages, Curtis 1000 sought temporary and permanent injunctive relief against Martin, Bean and ASB. Curtis 1000's claim for equitable relief against Martin and Bean was based on an alleged breach of their respective confidentiality and non-compete clauses of their contract with Curtis 1000. Curtis 1000's claim for equitable relief against ASB was based on its allegation that ASB tortiously interfered with Curtis 1000's contracts with Martin and Bean.

On November 29, 2004, a temporary restraining order was entered against Martin, Bean and ASB. On March 3, 2005, a preliminary injunction was entered against the defendants. Martin, Bean and ASB filed this timely appeal. Pending are the defendants' appeal of the preliminary injunction and a motion by the defendants asking us to certify a question to the Supreme Court of Georgia, to clarify whether Georgia enforces the type of non-compete clauses at issue here.

## A.    Standard of Review

"This Court reviews a district court's grant of a preliminary injunction for an abuse of discretion." *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 577 (6th Cir. 2006) (citing *Tucker v. City of Fairfield*, 398 F.3d 457, 461 (6th Cir. 2005)).  "A district court abuses its discretion when it relies on clearly erroneous findings of fact, improperly applies the law, or uses an erroneous legal standard." *Id.* (quotation omitted).  "This Court reviews the district court's conclusions of law *de novo* and its findings of fact for clear error." *Id.* (citing *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 653 (6th Cir. 1996)).  "Questions of contract interpretation are generally considered questions of law subject to *de novo* review." *Id.* (quotation omitted).  Because this case arises as an interlocutory appeal from a grant of a preliminary injunction, we "review[] the district court's . . . findings of fact for clear error." *Id.*

## B.    The Grant of a Preliminary Injunction

In determining whether to grant preliminary injunctive relief, a district court is required to consider:  "'(1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff may suffer irreparable harm absent the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of an injunction upon the public interest.'" *Yolton*, 435 F.3d at 578 (quoting *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson County*, 274 F.3d 377, 400 (6th Cir. 2001)).  These factors are to be balanced, as none, "standing alone, is a prerequisite to relief." *Id.* at 578.  However, "[a]lthough no one factor is controlling, a finding that

there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000) (citation omitted).

### 1. Likelihood of Success on the Merits Regarding Martin and Bean

#### a. Choice of Law

Martin's agreement with Curtis 1000 specified that it was to be governed by Georgia law and Bean's agreement with Curtis 1000 specified that it was to be governed by Delaware law. The district court correctly followed Tennessee's conflict-of-law rules to determine whether to give credit to the bargained-for choice-of-law provisions. *See Johnson v. Ventra Group, Inc.*, 191 F.3d 732, 738 (6th Cir. 1999) ("[A] federal court whose jurisdiction is based on diversity of citizenship must apply the conflict of law rules of the forum state.").

"Tennessee follows the rule of *lex loci contractus*." *Vantage Tech. LLC v. Cross*, 17 S.W.3d 637, 650 (Tenn. Ct. App. 1999) (citing *Ohio Cas. Ins. Co. v. Travelers Indem. Co.*, 493 S.W.2d 465, 467 (Tenn. 1973)). Under this rule, a court presumes that a contract is governed by the law of the jurisdiction in which the contract "was executed absent a contrary intent." *Vantage Tech*, 17 S.W.3d at 650 (citation omitted). Generally, if the parties intend to apply the laws of another jurisdiction, the courts will defer to the agreement. *Id*. There are certain requirements, however, that must be met prior to applying the other jurisdiction's laws to a contract executed in Tennessee. *Id*. First, the "choice of law provision must be executed in good faith." *Id*. (citing *Goodwin Bros. Leasing, Inc. v. H & B Inc.*, 597 S.W.2d 303, 306 (Tenn. 1980)). Second, the "jurisdiction whose law is chosen must bear a material connection to the transaction." *Id*. (citing *Goodwin Bros.*, 597 S.W.2d at 306)). Third, the "basis for the choice of another jurisdiction's law must be reasonable and not

merely a sham or subterfuge." *Id.* "Finally, the parties' choice of another jurisdiction's law must not be contrary to a fundamental policy of a state having a materially greater interest and whose law would otherwise govern." *Id.* (citing *Goodwin Bros.*, 597 S.W.2d at 306 n.2 (quotation omitted)).

### i. Martin's Agreement

The district court found that the provision in Martin's agreement specifying that Georgia law should apply was valid. On appeal, the parties agree that the district court was correct in its determination that "Georgia clearly has a substantial relationship to this matter," and that the rule of *lex loci contractus* allows for enforcement of Martin's choice-of-law provision. The district court, in determining that Georgia law should apply, correctly found that "Curtis 1000 is headquartered in Georgia, Martin attended meetings at Curtis 1000's offices in Georgia, and Martin routinely communicated with Curtis 1000 personnel located in Georgia," even though Martin worked in Tennessee. Therefore, an analysis of Martin's agreement under Georgia law is appropriate.

### ii. Bean's Agreement

Applying the rule of *lex loci contractus* to Bean's agreement, the district court found, and the parties agreed, that "Delaware does not have a substantial and material connection to the parties or to the events at issue," because "Bean did not perform any work in Delaware and Curtis 1000 does not have any office in Delaware." The district court found that, because Tennessee and Georgia have "more substantial connection to the events giving rise to this suit," it would analyze Bean's contract under both Tennessee and Georgia law. While in his brief to Bean argues that

- 9 -

Georgia law is applicable, at oral argument he conceded that his contract is properly interpreted under Tennessee law.

Insofar as the district court concluded that Bean's contract was governed by Georgia law, it erred. Under *lex loci contractus*, we are to presume that a contract is governed by the law of the jurisdiction in which the contract "was executed absent a contrary intent." *Vantage Tech*, 17 S.W.3d at 650. (citation omitted). At the time he executed the contract Bean's intent was to have the law of Delaware applied if a dispute arose. As it is clear that the rule of *lex loci contractus* prevents Delaware law from being applied in this instance, we must defer to the default that the contract is governed by the law of the jurisdiction in which it was executed — in this case, Tennessee. Therefore, analysis of Bean's agreement under Tennessee law is appropriate.

### b. Applying Georgia Law to Martin's Contract

The district court looked to various sources of Georgia law and determined that Martin's non-compete clause was enforceable. The district court erred in this determination.

In *Waldeck v. Curtis 1000, Inc.*, 583 S.E.2d 266 (Ga. Ct. App. 2003), to which Curtis 1000 was a party, the Georgia Court of Appeals determined that a non-compete clause identical to Martin's was unenforceable. *Id*. at 267, 269. The *Waldeck* Court first looked to the Supreme Court of Georgia for guidance and determined that a:

> restrictive covenant in an employment agreement is in partial restraint of trade and will be enforced only if the restraint imposed is reasonable, is founded on a valuable consideration, is reasonably necessary to protect the interest of the party in whose favor it is imposed, and does not unduly prejudice the interests of the public.

*Id*. at 268 (citing *W. R. Grace & Co. v. Mouyal*, 422 S.E.2d 529, 531 (Ga. 1992)). The *Waldeck* Court then held while a prohibition preventing an "*affirmative* act on the part of the former

- 10 -

employee, such as solicitation, diversion, or contact with clients, may be reasonable, a covenant prohibiting a former employee from merely accepting business, without any solicitation, is not reasonable." *Id.* (citations omitted) (emphasis in original). The *Waldeck* Court so determined that the non-compete clause identical to that at issue here, "unreasonably impacts on [a former employee] and on the public's ability to choose the business it prefers." *Id.* (citing *W. R. Grace*, 422 S.E.2d at 529 and *Singer v. Habif, Arogeti & Wynne*, 297 S.E.2d 473, 475 (Ga. 1982)).[1] *See*, *e.g.*, *Singer*, 297 S.E.2d at 475 ("In this case, we find the covenant unreasonable because it overprotects the legitimate interests of HAW and unreasonably affects Singer by prohibiting him from *accepting* or soliciting work from *any* clients of HAW." (emphasis in original)).

The *Waldeck* Court then distinguished three Supreme Court of Georgia cases that Curtis 1000 argued required a contrary result. In examining *Bennett v. Ga. Indus. Catering Co.*, 149 S.E.2d 81 (Ga. 1966), the *Waldeck* Court correctly determined that the issue before the Supreme Court of Georgia was whether a clause prohibiting "soliciting or receiving continued patronage was void due to indefiniteness and vagueness." *Waldeck*, 583 S.E.2d at 268. In examining *Coffee System of Atlanta v. Fox*, 176 S.E.2d 71 (Ga. 1970), the *Waldeck* Court correctly determined that the issue before the Supreme Court of Georgia "was not whether accepting business from former customers amounted to solicitation, as prohibited by the nonsolicitation clause; it was whether the clause

---

[1] At oral argument, Curtis 1000 cited to *McCurry v. McCurry*, 155 S.E.2d 378 (Ga. 1967), for the proposition that, because *Singer* is a plurality opinion, under Georgia Supreme Court Rule 58, it does not have precedential value and, therefore, we should ignore it. However, insofar as other cases, including from the Supreme Court of Georgia, *see*, *e.g.*, *Orkin Exterminating Co. v. Walker*, 307 S.E.2d 914, 917 (Ga. 1983) (in applying *Singer*, the court held that a "company cannot prevent [employees] from merely accepting overtures from [former] customers"), have relied on *Singer*, their precedent is properly considered.

prohibiting, inter alia, soliciting or receiving continued patronage from former clients was void due to indefiniteness and vagueness." *Waldeck*, 583 S.E.2d at 268. Finally, in examining *Marcoin, Inc. v. Waldron*, 259 S.E.2d 433 (Ga. 1979), the *Waldeck* Court correctly determined that the Supreme Court of Georgia held that an "employee did not violate [a] nonsolicitation agreement by accepting business of former clients when there was no such prohibition in the agreement." *Waldeck*, 583 S.E.2d at 268. The *Waldeck* Court determined that, the statements in *Marcoin* which indicated that an employer could "prevent acceptance of business from former clients" if it added language to that effect in the agreement, was *dicta*. *Id*.

The *Waldeck* Court further distinguished these cases by citing to several Supreme Court of Georgia and Georgia Court of Appeals cases that were more recent in time, which indicated that under Georgia law, nonsolicitation provisions "may not contain a bar on the acceptance of business from unsolicited clients." *Id*. (citations omitted). "Contrary to Curtis 1000's contention," the *Waldeck* Court continued, "this rule applies even where the no-acceptance covenant is purportedly limited to the former employee's customers." *Id*. (citations omitted). Finally, the *Waldeck* Court concluded, because Georgia does not follow the "blue pencil"[2] doctrine of severability, the entire nonsolicitation clause is unenforceable. *Id*. (citation omitted).[3]

---

[2] The "blue-pencil test" is "[a] judicial standard for deciding whether to invalidate the whole contract or only the offending words." Black's Law Dictionary 183 (8th ed. 2004). If this standard applies, then "only the offending words are invalidated if it would be possible to delete them simply by running a blue pencil through them, as opposed to changing, adding, or rearranging words." *Id*.

[3] The parties agree that Georgia does not follow the blue-pencil doctrine and, therefore, if the *Waldeck* Court's statement of the law is correct, then the entirety of Martin's non-compete clause must be invalidated.

In *Pregler v. C & Z, Inc.*, 575 S.E.2d 915 (Ga. Ct. App. 2003), the Georgia Court of Appeals again determined that "the nonsolicitation clause contained in the agreement is unenforceable because it prevents [the former employee] from accepting business from *unsolicited* clients." *Id.* at 916. Further, the court held that "[t]he restraint is overbroad" in that "[i]t prohibits not only solicitation of former clients but also acceptance of any work from such clients regardless of who initiated the contact." *Id.* This restraint on trade is unreasonable, "[b]ecause in addition to overprotecting [the company's] interest, it unreasonably impacts on [the former employee] and on the public's ability to choose the professional services it prefers." *Id.* (citation omitted). The *Pregler* Court came to this conclusion mindful of the Supreme Court of Georgia's balancing test requiring that nonsolicitation covenants "may be upheld only when" the restrictions consider "the business interests of the employer needing protection and the effect of the restrictions on the employee." *Id.* (citing *Nat'l Settlement Assocs. v. Creel*, 349 S.E.2d 177, 179 (Ga. 1986)).

Analyzing what it believed to be the correct Supreme Court of Georgia precedent, the district court determined that "the restrictive covenants in Martin's agreements are reasonable and are enforceable in partial restraint of trade." However, none of the Supreme Court of Georgia cases that the district court relied upon examined the specific type of nonsolicitation/noncompete clause in this case or held that this type of clause was enforceable. *See American Software USA v. Moore*, 448 S.E.2d 206, 209 (Ga. 1994) ("[A] non-disclosure restrictive covenant, which is strictly limited to appellant's 'trade secrets' and 'confidential business information,' is not unreasonable." (citations omitted)); *W. R. Grace*, 422 S.E.2d at 531 ("The focus of this case is the absence of an express geographic description of the territorial restriction contained in the no[n]-solicitation clause of the

employment contract."); *Nunn v. Orkin Exterminating Co.*, 350 S.E.2d 425, 427 (Ga. 1986) ("[A clause which] protect[s] confidential information relating to its business is a restraint [that is not] so broad as to be unreasonable."); *Rollins Protective Servs. Co. v. Palermo*, 287 S.E.2d 546, 550 (Ga. 1982) (A clause preventing the disclosure of "trade secret[s] or confidential information" is enforceable); *Barry v. Stanco Commc'ns Prods., Inc.*, 252 S.E.2d 491, 494 (Ga. 1979) ("[T]he territorial limitation in this case was reasonable, and a legitimate protection of [the employer's] investment in customer relations."). Additionally, the district court relied on the aforementioned three Supreme Court of Georgia cases distinguished by the *Waldeck* Court.

### i. The District Court's Error of Law

Contrary to the conclusions reached by the district court, we believe that the Supreme Court of Georgia would adopt the *Waldeck* and *Pregler* holdings. Although the issue was not before it, in *W.R. Grace* the Supreme Court of Georgia stated in *dicta* that "the prohibition against post-employment solicitation of any customer of the employer located in a specific geographic area is an unreasonable and overbroad attempt to protect the employer's interest in preventing the employee from exploiting the personal relationship the employee has enjoyed with the employer's customers." *W. R. Grace*, 422 S.E.2d at 532 (citations omitted). Additionally, although a plurality decision, the Supreme Court of Georgia's *Singer* holding stands opposite the district court's conclusion. *See Singer*, 297 S.E.2d at 475 ("In this case, we find the covenant unreasonable because it overprotects the legitimate interests of [the employer] and unreasonably affects [the employee] by prohibiting him from *accepting* or soliciting work from *any* clients of [his former employer]." (emphasis in original)). *See also Orkin Exterminating Co.*, 307 S.E.2d, 917 (Ga. 1983) (in applying

*Singer*, the court held that a "company cannot prevent [employees] from merely accepting overtures from [former] customers").

"Where jurisdiction rests on diversity of citizenship," as is the case here, "federal courts, under the doctrine of *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938), must follow the decisions of intermediate state courts in the absence of convincing evidence that the highest court of the state would decide differently." *Stoner v. New York Life Ins. Co.*, 311 U.S. 464, 467 (1940). *See also Birgel v. Board of Comm'rs*, 125 F.3d 948, 951 (6th Cir. 1997) (holding that "the federal court was bound to apply the decisions of the state appellate court" absent evidence that the state Supreme Court would rule otherwise (citing *Stoner*, 311 U.S. at 467–68)). This is especially true "where the intermediate state court has determined the precise question in issue in an earlier suit between the same parties, and the highest court of the state has refused review." *Stoner*, 311 U.S. at 467. *See also Birgel*, 124 F.3d at 951.

In this case, there is no evidence that the Supreme Court of Georgia would analyze Martin's restrictive covenant any differently than either the *Waldeck* Court in analyzing the same restrictive covenant or the *Pregler* Court in analyzing a functionally similar restrictive covenant. In fact, the only Supreme Court of Georgia cases on point support both the *Waldeck* and *Pregler* holdings. Therefore, under the *Erie* doctrine, because there is not "convincing evidence that the highest court of the state would decide [this case] differently," *Birgel*, 125 F.3d at 951 (quoting *Stoner*, 311 U.S. at 467), we will follow *Waldeck* — which decided this exact issue — and *Pregler*.[4]

---

[4]Additionally, in *Palmer & Cay, Inc. v. Marsh & McLennan Cos.*, 404 F.3d 1297 (11th Cir. 2005), a case rendered after the district court's opinion in this case, the Eleventh Circuit analyzed a restrictive covenant factually indistinct from Martin's. The Eleventh Circuit held that "Georgia

- 15 -

Therefore, because the district court erred in determining that Georgia law allows the restrictive covenant present in Martin's contract, we reverse the district court's grant of a preliminary injunction against Martin. Simply, Curtis 1000 cannot show that it is likely that it will succeed on the merits, because Georgia law disallows the restrictive covenant in Martin's contract and that covenant cannot be blue-penciled. Because Curtis 1000 is not likely to succeed on the merits, we need not address the remaining three factors.

### c. Applying Tennessee Law to Bean's Contract

---

courts refuse to enforce employment non-competition agreements that prohibit the employee from accepting unsolicited business from former clients after leaving employment." *Id*. at 1306 (citing *Waldeck*, 583 S.E.2d at 268; *Singer*, 297 S.E.2d at 475). Further, in *MacGinnitie v. Hobbs Group, LLC*, 420 F.3d 1234 (11th Cir. 2005), the Eleventh Circuit analyzed another restrictive covenant under Georgia law. In applying *Pregler*, the Eleventh Circuit held that "contractual provisions which prevent employees from accepting business from unsolicited former clients" are overbroad. *Id*. at 1242 (citing *Pregler*, 575 S.E.2d at 915).

Insofar as the Eleventh Circuit has determined that the *Waldeck* and *Pregler* holdings are correct — and in fact the Eleventh Circuit applied the Supreme Court of Georgia's *Singer* precedent in reaching that conclusion — we give the Eleventh Circuit's analysis of state law within its circuit deference. *United States v. Maness*, 23 F.3d 1006, 1008 (6th Cir. 1994) (citing *Factors Etc., Inc. v. Pro Arts, Inc.*, 652 F.2d 278, 283 (2d Cir. 1981), *cert. denied*, 456 U.S. 927 (1982)). *See also Leavitt v. Jane L.*, 518 U.S. 137, 145 (1996) (The "general presumption" is "that circuit courts correctly decide questions of state law" of states within their circuits. (citations omitted)); *Helvering v. Stuart*, 317 U.S. 154, 172 (1942) ("When state law has not been authoritatively declared we pay great deference to the reasoned opinion of circuit courts of appeals, whose duty it is to ascertain from all available data what the highest court of the state will probably hold the state law to be." (citations omitted)); *Blue Cross & Blue Shield Mut. v. Blue Cross & Blue Shield Ass'n*, 110 F.3d 318, 328 (6th Cir. 1997) (holding that "the conclusions of a sister circuit about the law of a state within that circuit" is persuasive (citations omitted)); *Abex Corp. v. Maryland Cas. Co.*, 790 F.2d 119, 125–26 (D.C. Cir. 1986) ("[W]e will defer to the local circuit's view of the law of a state in its jurisdiction when that circuit has made a reasoned inquiry into state law, unless we are convinced that the court has ignored clear signals emanating from the state courts." However, "such a clear misreading of state law will rarely occur.").

In Tennessee, "restrictive covenants against competition in employment contracts will be enforced where reasonable under the particular circumstances [which] include time, territory, and adequate contractual consideration under the circumstances." *Myers v. AP Propane*, No. 91-5119, 1991 U.S. App. LEXIS 23170, *4 (6th Cir. Sept. 30, 1991) (citing *Central Adjustment Bureau, Inc. v. Ingram*, 678 S.W. 2d 28, 32-33 (Tenn. 1984)). Covenants not to compete "are construed strictly in favor of the employee." *Vantage Tech.*, 17 S.W.3d at 644. In determining whether a covenant not to compete is reasonable, a court looks to "'the consideration supporting the agreements; the threatened danger to the employer in the absence of such an agreement; the economic hardship imposed on the employee by such a covenant; and whether or not such a covenant should be inimical to public interest.'" *Id.* (quoting *Allright Auto Parks, Inc. v. Berry*, 409 S.W.2d 361, 363 (Tenn. 1966)). The "threshold question is whether the employer has a legitimate business interest, i.e., one that is properly protectable by a non-competition covenant." *Vantage Tech.*, 17 S.W.3d at 644 (citation omitted).

> Several principles guide the determination of whether an employer has a business interest properly protectable by a non-competition covenant. Because an employer may not restrain ordinary competition, it must show the existence of special facts over and above ordinary competition. These facts must be such that without the covenant, the employee would gain an unfair advantage in future competition with the employer. Considerations in determining whether an employee would have such an unfair advantage include (1) whether the employer provided the employee with specialized training; (2) whether the employee is given access to trade or business secrets or other confidential information; and (3) whether the employer's customers tend to associate the employer's business with the employee due to the employee's repeated contacts with the customers on behalf of the employer. These considerations may operate individually or in tandem to give rise to a properly protectable business interest.

*Id.* (citations omitted).

Appellants acknowledge that there is no Tennessee law directly on point concerning whether a non-solicitation clause in a contract is invalid when it prohibits a former employee from accepting unsolicited business. Bean argues that the district court misapplied the factors or erroneously determined facts in applying the factors enumerated in *Vantage Tech.*. While we review a district court's legal conclusions *de novo*, we have found no reason to disturb the district court's conclusion that Tennessee law allows the restrictive covenant in Bean's contract to be enforced.

In analyzing the factors, the district court held:

> The contract [is] supported by adequate consideration in light of Bean['s] . . . longstanding employment with Curtis 1000. There is no evidence to support a finding that the restrictive covenants are deliberately unreasonable or oppressive. Rather, Curtis 1000 has a strong and legitimate business interest in preserving its customer base that is properly enforced through restrictive covenants. The evidence overwhelmingly shows that Bean . . . became the "face" of Curtis 1000 to the customers [he] served for many years. Accordingly, Curtis 1000 has a protectible interest in the goodwill Bean . . . generated with those customers on behalf of Curtis 1000. Although Curtis 1000 provided little to Bean . . . in the way of specialized training, Curtis 1000 is nonetheless entitled to the protection of its confidential business information, including customer lists and pricing. The covenants are narrowly tailored in time and territory. Curtis 1000 faces danger, and has already sustained damages, by virtue of Bean's . . . violation[] of [his] agreement[]. While a preliminary injunction would no doubt impose some economic hardship on Bean . . ., [he] is still free to pursue other customers [he] did not serve while employed by Curtis 1000. Enforcement of the restrictive covenants is not inimical to the public interest because public policy supports the enforcement of contracts which preclude unfair competition.

Bean disputes this analysis by claiming that he did not have any access to confidential information. He further disputes the district court's characterization that he was the "face" of Curtis 1000. While the record contains evidence contrary to that found by the district court, the record also reflects the facts as found by the district court. We cannot say that the district court's factual findings were

clearly erroneous. Bean cannot show, therefore, that the district court erred in determining that Curtis 1000 had a likelihood of success on the merits

## 2. Likelihood of Success on the Merits Regarding ASB

In proscribing the procurement of breach of contract, Tennessee law provides that "[i]t is unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto." Tenn. Code § 47-50-109. Under Tennessee law,

> [i]n order to recover for procurement of a breach of contract the plaintiff must prove that there was a legal contract, of which the wrongdoer was aware, that he maliciously intended to induce a breach, and there must have been a breach, proximately caused by his acts, resulting in damages.

*Polk & Sullivan, Inc. v. United Cities Gas Co.*, 783 S.W.2d 538, 543 (Tenn. 1989) (citation omitted).

To prevail on a claim for intentional interference with a business relationship, a plaintiff must prove:

> (1) [A]n existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means, and finally, (5) damages resulting from the tortious interference.

*Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002) (footnote and citations omitted).

The district court's conclusion that Curtis 1000 was likely to succeed on the merits of these claims against ASB is a factual determination reviewed under the clearly erroneous standard. *See Yolton*, 435 F.3d at 577 ( "This Court reviews the district court's . . . findings of fact for clear error.").

- 19 -

As to the first claim, the district court held that:

[T]he evidence tends to show that (1) Martin and Bean had legal contracts with Curtis 1000; (2) ASB had knowledge of those contracts; (3) ASB harbored an intention to induce breach of the contracts; (4) ASB acted with malice; (5) Martin and Bean breached their contracts; (6) the inducement was the proximate cause of the breach; and (7) damages resulted from the breach.

As to the second claim, the district court held that:

[T]he evidence tends to establish a claim for intentional interference with business relationships because Curtis 1000 can show (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) ASB's knowledge of that relationship and not a mere awareness of Curtis 1000's business dealings with others in general; (3) ASB's intent to cause the breach or termination of the business relationship; (4) ASB's improper motive or improper means; and (5) damages resulting from the tortious interference.

In making these determinations, the district court reviewed the evidence before it and cases from other jurisdictions involving Curtis 1000 and this specific issue. On appeal, ASB points to other evidence that it believes shows that the district court's findings of fact were clearly erroneous. ASB challenges the accuracy of the depositions upon which the district court relied and highlights that the district court misinterpreted ASB's hiring policy. However, the district court relied on the record and, insofar as there are genuine issues of material fact, such issues are appropriate for trial. At the preliminary injunction stage, we only reverse factual findings if they are clearly erroneous, and there is nothing in the record to indicate that the district court's crediting of some evidence over the evidence "preferred" by ASB was clearly erroneous.

The district court determined, however, that because Martin was in breach of his contract, ASB could be held liable under both the procurement and intentional interference claims as they related to Martin. Insofar as the restrictive covenant in Martin's contract is void for public policy,

as discussed *supra*, ASB could not have either procured a breach of contract or intentionally interfered with Martin's contract because Martin did not breach his contract.  In that the district court enjoined ASB from employing Martin, and in that Curtis 1000 cannot show that it is likely to succeed on the merits of its claims against ASB as they relate to Martin's employment with ASB because a breach of contract is a prerequisite to recovery, we reverse the district court's injunction against ASB.  In that the district court's determinations are not clearly erroneous as they relate to Bean's employment with ASB, we do not disturb the district court's conclusion that Curtis 1000 will likely succeed on the merits of its case against ASB.

### 3.  Irreparable Harm to the Plaintiff Absent the Injunction

Whether a plaintiff will suffer irreparable harm absent an injunction is a fact-based inquiry. *Jackson v. City of Columbus*, 194 F.3d 737, 751 (6th Cir. 1999).  While it is true that a plaintiff cannot show irreparable harm if its damages are fully compensable monetarily, *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992) (citation omitted), it is likewise true that "[t]he loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute," *id*. at 512 (citation omitted).  The district court concluded that "Curtis 1000 has . . . suffered a loss of the goodwill of its customers."  Bean and ASB challenge that factual assertion with evidence in the record.  The district court's factual findings, however, are likewise supported by record evidence.

Therefore, the district court's determination that Curtis 1000 would suffer irreparable harm absent the injunction should not be disturbed.

### 4.  Substantial Harm to Others

- 21 -

Whether others will suffer substantial harm absent an injunction is a fact-based inquiry. *Parker v. USDA*, 879 F.2d 1362, 1367 (6th Cir. 1989). "Others" include "defendants." *See*, *e.g.*, *Anglers of the Au Sable v. United States Forest Serv.*, 402 F. Supp. 2d 826, 838 (E.D. Mich. 2005). It is true that Bean will suffer monetary losses due to being enjoined. It is unclear, however, what damages ASB will suffer other than speculating that ASB will lose some business. These losses, however are insubstantial in light of the fact that they are unlikely to prevail on the merits  Finally, the district court could not identify any other parties who would be substantially injured by an injunction. Therefore, the district court correctly balanced this factor as to Bean and ASB.

### 5. Impact of Injunction on the Public Interest

The district court correctly found that an injunction would have "a limited effect on the public interest."

## C. Motion to Certify a Question to the Supreme Court of Georgia

Defendants filed a motion in this Court to certify a question to the Georgia Supreme Court; namely whether *Waldeck* correctly states Georgia law.[5]

We will certify a question to a state's highest court "when the question is new and state law is unsettled." *Transamerica Ins. Co. v. Duro Bag Mfg. Co.*, 50 F.3d 370, 372 (6th Cir. 1995) (citations omitted). Further, certification is appropriate "where an important question of state law has arisen solely in federal court." *Geib v. Amoco Oil Co.*, 29 F.3d 1050, 1060 (6th Cir. 1994).

---

[5] The exact wording of the question is: "namely [do] Georgia courts refuse to enforce non-competition agreements that prohibit the employee from accepting unsolicited business from former clients after leaving employment."

As we have noted, this issue has been thoroughly analyzed by the Supreme Court of Georgia, the Georgia Court of Appeals, and the Eleventh Circuit. Accordingly, we see no need to certify this question to the Supreme Court of Georgia and, therefore, deny the defendants' motion.

**III.**

For the foregoing reasons we **REVERSE** the district court's grant of a preliminary injunction against Martin, **AFFIRM** the district court's grant of a preliminary injunction against Bean, **REVERSE** the district court's grant of a preliminary injunction against ASB insofar as that injunction relates to ASB's relationship with Martin, **AFFIRM** the district court's grant of a preliminary injunction against ASB insofar as that injunction relates to ASB's relationship with Bean, and **REMAND** to the district court for proceedings consistent with this Court's opinion. Further, we **DENY** the defendants' motion to certify a question to the Supreme Court of Georgia.

- 23 -